## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TROY RHODES**                                                    **CIVIL ACTION**

**VERSUS**                                                         **NO. 11-399**

**BURL CAIN, WARDEN**                                              **SECTION "C"(2)**

### ORDER AND REASONS ON PETITIONER'S MOTION
### FOR EVIDENTIARY HEARING AND TO EXPAND RECORD;
### REPORT AND RECOMMENDATION NO. 2

Upon filing, this petition for a writ of habeas corpus was automatically referred

to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing

if necessary, and to submit proposed findings and recommendations for disposition

pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules

Governing Section 2254 Cases. On December 11, 2012, about six months after the

retirement of the magistrate judge to whom it was originally assigned, the case was

reallotted to me.[1]

On March 27, 2013, I issued a report and recommendation that two of Rhodes's

claims should be dismissed as procedurally barred.[2] These claims were that (a) the State

knowingly suborned perjury from the victim in violation of <u>Napue v. Illinois</u>, 360 U.S.

264 (1959); and (b) Rhodes's counsel was ineffective in failing to use the victim's

---

[1]Internal Court Docket Sheet Entry dated 12/11/12.

[2]Record Doc. No. 27 at pp. 17-25.

medical records to impeach the victim's trial testimony.[3]  I also recommended that Rhodes's remaining claims should be dismissed on the merits.[4]

In response to my report and recommendation, Rhodes submitted two separate filings. On April 8, 2013, he filed objections to the report and recommendation.[5]  Three months later, on July 1, 2013, Rhodes filed a motion to amend his petition.[6]  On July 22, 2013, the presiding district judge issued an Order and Reasons stating that "Rhodes' motion [to amend] addresses his claim of ineffective assistance of trial counsel for trial counsel not making use of medical records to impeach key identification evidence."[7] The district judge granted the motion to amend, vacated my report and recommendation, and referred the matter back to me for preparation of a report and recommendation "that includes petitioner's substantive claims in the motion to amend."[8]

---

[3]Rhodes previously abandoned a fifth claim; i.e., that the State failed to provide the defense with the victim's medical records in violation of Brady v. Maryland, 373 U.S. 83 (1963). It is clear that the medical records were, in fact, provided to counsel in response to pretrial discovery motions, introduced in evidence at trial as Exhibit 17, and viewed by the jury. State Record Vol. 4 of 9 (Trial transcript at pp. 106-07); Vol. 1 of 9 (defense "Motion for discovery of . . . Victim Medical Reports;" State's motion for subpoena duces tecum).

[4]Id. at pp. 28-41.

[5]Record Doc. No. 28.

[6]Record Doc. No. 29.

[7]Record Doc. No. 30, p. 1.

[8]Id. at p. 4.

I have interpreted the referral order as a rejection of my previous procedural default recommendation and a requirement that I bypass the State's procedural default defense and address the substance or merits of all of petitioner's claims. This report and recommendation does so.

I.   ORDER AND REASONS ON PETITIONER'S MOTION FOR EVIDENTIARY HEARING AND TO EXPAND THE RECORD

Shortly after the district judge's order referring the matter back to me, Rhodes filed a "Request for Evidence Hearing; Motion to Expand the Record (Rule 7)." Record Doc. No. 32.  In this motion, Rhodes asserts that "[t]he evidence [he] would like to present at an evidence (sic) hearing is a police report that fully supports his allegation of perjury . . . as to time drugs were administered" to the victim, David Blohm. Id. at p. 2. He argues that comparing the victim's medical records of that same date, June 25, 2002, which he would also like to submit at an evidentiary hearing, "will pinpoint the exact time" that the victim was administered medication and support the allegation that Blohm testified falsely as to "whether he was under the influence of any medications that may have compromised the reliability of his identification [of Rhodes as the perpetrator] at the time he made it." Id.  Rhodes attaches both the police report and the medical records to his motion, id. at pp. 5-11, and acknowledges in his motion that these items are already part of the [state court] record, this is just for the courts (sic) convenience." Id. at p. 2.

Under these circumstances, the motion is denied in part insofar as it seeks a live federal evidentiary hearing in court because such a hearing is unnecessary. Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

None of these circumstances are presented in the instant case, and the materials Rhodes seeks to present at an evidentiary hearing are already before the court. In addition, the police report provides no evidence of the actual administration of medication to the victim while he was hospitalized.  Since the subject materials are already in the state court record, there is also no need to "expand" the record to include them. Nevertheless, the motion is granted in part in that the attachments to the motion will be permitted to remain in this court's record for easy reference, especially as to the medical records, and for the convenience of the court and all parties.

## II.   REPORT AND RECOMMENDATION NO. 2 ON HABEAS PETITION

For the following reasons, I again recommend that the instant petition for habeas corpus relief be **DENIED** and the petition **DISMISSED WITH PREJUDICE**.

## (A)   STATE COURT FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, Troy Rhodes, is incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[9]  On August 22, 2002, Rhodes was charged in a two-count bill of information in the Orleans Parish Criminal District Court with armed robbery and attempted second degree murder.[10]  The Louisiana Fourth Circuit Court of Appeal summarized the facts of the case as follows:

> The victim, David Blohm ("Blohm"), testified that on 19 June 2002, he was employed as a delivery person for Leidenheimer Bakery.  On that same date, between the hours of 10:00 and 11:00 a.m., he had completed his delivery to A&D Food Store on Touro Street in New Orleans and returned to his delivery truck when a man, later identified as Rhodes, entered the truck on the passenger side holding a sawed off shotgun.  The person demanded Blohm's money.  Blohm cooperated and turned over $160.00 of his delivery money.  The perpetrator was not satisfied with the sum and insisted that Blohm must have had more.  Blohm removed his wallet and gave the perpetrator $60.00 of his personal funds.  Still not satisfied, the perpetrator kept asking for more money.  Blohm told him that he did not have anymore.  The perpetrator asked for Blohm's wallet, but Blohm did not comply.  The perpetrator forced Blohm out of the truck on to the sidewalk where Blohm was shot once in the abdomen. The perpetrator fled the scene.
>
> Blohm made his way back into the A&D Food Store where the clerk called for medical assistance.  Blohm was transferred to Charity Hospital.  Blohm testified that while in his delivery truck and on the sidewalk he stood three to five feet away from the perpetrator, and he had an opportunity to look at him for almost two minutes each time.

---

[9] Record Doc. No. 1.

[10] State Record Vol. 1 of 9.

Basem Abed ("Abed"), a clerk at and co-owner of A&D Food Store, testified that on the day Blohm was robbed and shot, Rhodes was in the store to purchase beer thirty to forty-five minutes before the shooting. Abed further testified that Blohm made his bread delivery, made a purchase, and returned to his truck. A short time later Blohm returned to the store and said he had been shot. Abed testified that he walked to the door of the store but did not see anyone. According to Abed, three days after the shooting Rhodes returned to A&D Food Store to ask if someone had said he had shot the bread man. Abed and the storeowner told Rhodes that they had not said that he shot the bread man.

Lieutenant Christy Williams, of the New Orleans Police Department, testified that she conducted a follow-up investigation in the robbery and shooting of Blohm. On the day of the shooting Lieutenant Williams attempted to speak to Blohm, but she was unable to do so because of Blohm's condition. The lieutenant further testified that she developed suspects in the shooting and composed a photo line-up. On 22 June 2002, Lieutenant Williams showed Blohm the photo line-up, but he was unable to make an identification.

On 24 June 2002, Lieutenant Williams composed a second photo lineup and presented it to Blohm. However, Blohm was not feeling well, and again was unable to make an identification. Lieutenant Williams testified that she received information from Officer Juan Barnes assigned to the CrimeStoppers tip line regarding the identity of the perpetrator in Blohm's robbery and shooting. Lieutenant Williams verified the information and composed a third photo line-up. Blohm was shown the third line-up, and he identified Rhodes as the perpetrator. Lieutenant Williams prepared an arrest warrant for Rhodes and search warrants for his last two known addresses. From the first address searched, the police retrieved a pair of blue jean shorts fitting the description of those worn by the perpetrator, letters and papers with Rhodes' name on them, and a photo of him.

Lieutenant Williams further testified that she received a phone call from someone saying that he knew the location of the shotgun used in the robbery and shooting. Again, Lieutenant Williams verified the information and obtained a search warrant for the location given in the information. The caller indicated the gun could be found inside or outside of the location. The residence at 2171-2173 North Dorgenois Street was searched and a shotgun was found wrapped in a shirt under the house near some concrete steps.[11]

---

[11] State v. Rhodes, 871 So.2d 1280 (Table), 2003-KA-1326 (La. App. 4th Cir. 04/14/04); State Record Vol. 2 of 9.

On November 20, 2002,[12] a hearing was held concerning Rhodes's motions to suppress.  After the hearing, the trial court denied defense motions to suppress (a) the shotgun found under the house at 2171-73 North Dorgenois Street, and (b) the victim's photo identification of Rhodes and found probable cause.[13]  Because a witness, Basem Abed, was not available to testify, the court held open Rhodes's motions regarding Abed's statements and photo identification.[14]

After a pretrial hearing on February 26, 2003,[15] the trial court granted the motion to suppress Abed's photo identification of Rhodes.[16]  The court did not rule on Rhodes's motion to suppress Abed's statements and deferred ruling to a later date.[17]  On March 12, 2003, the court suppressed "the statement made by Mr. Abed in reference to seeing the defendant, Rhodes, in his store forty-five minutes prior to the shooting" and suppressed "statements made by Mr. Rhodes to Mr. Abed two to three days after the shooting."[18]  On March 28, 2003, the trial court "reversed itself," holding that Abed's statements as

---

[12]State Record Vol. 3 of 9 (hearing transcript, p. 125).

[13]Id. at pp. 168-70.

[14]Id. at pp. 170-71.

[15]Id. (hearing transcript, p. 175).

[16]Id. at p. 211.

[17]Id. at 204-12.

[18]State Record Vol. 1 of 9. The trial court's March 12, 2003 ruling is marked "PER CURIAM."

to when he saw Rhodes on the date of the shooting and what Rhodes said to Abed two or three days after the incident were admissible.[19]

Trial commenced on June 4, 2003.[20]  One day later, the jury found defendant guilty as charged.[21]  On June 25, 2003,[22] the trial court took notice that Rhodes had two prior armed robbery convictions and sentenced him as follows:

> I'm sentencing the defendant to ninety-nine years [in the] Department of Corrections without benefit of probation, parole, suspension of sentence and fifty years [in the] Department of Corrections without benefit of probation, parole, suspension of sentence on each count respectively.[23]

On September 8, 2003, Rhodes's appointed counsel filed a direct appeal.  Counsel argued that the trial court erred in accepting the jury's guilty verdicts because there was insufficient evidence to support the convictions and challenged the trial court's evidentiary rulings.[24]  On January 30, 2004, retained defense counsel filed a supplemental appellate brief[25] asserting the following arguments:  (1) The evidence did not support the

---

[19]State Record Vol. 3 of 9, Minute Entry, 3/28/03.

[20]State Record Vol. 4 of 9, p. 217.

[21]State Record Vol. 1 of 9, Jury Verdicts, 6/5/03.

[22]State Record Vol. 4 of 9, p. 355.

[23]Id. at p. 364.  The trial court declined to specify whether the sentences were to run concurrently or consecutively, stating: "They are to run the way the Department of Corrections says they run . . . ."

[24]State Record Vol. 3 of 9, Appeal Brief, 2003-KA-1326, 09/08/03.

[25]In his brief, retained counsel wrote that he was contacted on January 10, 2004 to represent Rhodes on appeal.  He was allowed to enroll and was given until January 30, 2004 to file a supplemental

guilty verdicts.  (2) The trial court erred in admitting testimony regarding the recovered shotgun and hearsay.[26]   (3) The trial court erred in denying Rhodes's motion to reconsider the sentences because they were excessive.[27]

On April 14, 2004, the Louisiana Fourth Circuit Court of Appeal affirmed Rhodes's convictions.  However, the court determined that it was "precluded" from ruling on Rhodes's motion to reconsider his sentences and his excessive sentence claim because the trial court had failed to rule on the motion and consider the excessiveness claim supporting the motion.  The appellate court remanded the matter to the trial court.[28]  On May 7, 2004, the trial court denied Rhodes's motion to reconsider his sentences.[29]

On May 12, 2004, Rhodes's retained counsel timely filed a writ application with the Louisiana Supreme Court, asserting the same claims raised on appeal, including the claim that the trial court erred in denying Rhodes's motion to reconsider his sentences

---

brief. State Record Vol. 3 of 9 (supplemental brief, p. 3).

[26]Claim (2) represents a compilation of Assignments of Error (2) and (3), Supplemental Brief, p. 8.

[27]Claim (3) represents a compilation of Assignments of Error (4) and (5), Supplemental Brief, p. 8.

[28]State v. Rhodes, 871 So.2d 1280 (Table), Case No. 2003-KA-1326 (La. App. 4th Cir. 04/14/04); State Record Vol. 2 of 9.

[29]State Record Vol. 1 of 9 (minute entry, 5/7/04). Rhodes did not file a writ application with the state appellate court seeking relief in connection with the trial court's denial of this motion.

and that his sentences were excessive.[30]  On October 15, 2004, the Louisiana Supreme Court denied Rhodes's writ application without opinion.[31]

Rhodes's convictions became final 90 days later, on January 13, 2005, when he did not file a writ application with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003) (citing 28 U.S.C. § 2244(d)(1)(A); Flanagan v. Johnson, 154 F.3d 196, 200-01 (5th Cir. 1998)); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (citing 28 U.S.C. § 2244(d)(1)(A)); U.S. Sup. Ct. R. 13(1).

About seven (7) months later, on August 12, 2005, Rhodes, through counsel, filed an application for post-conviction relief in the state trial court.[32]  Counsel asserted the following claims:  (1) Rhodes was denied effective assistance of trial counsel due to counsel's failure to have hearsay statements and testimony regarding the recovered shotgun suppressed.  (2) Rhodes was denied effective assistance of trial counsel due to counsel's failure to investigate and seek a continuance, recess or mistrial when State witness Abed appeared at trial to offer testimony without an interpreter.  (3) The trial court erred in denying the motion to reconsider the excessive sentence.[33]  On January 3, 2006, Rhodes filed a pro se motion to recuse the trial judge, arguing that the judge was

---

[30]State Record Vol. 1 of 9 (Application for Writs, Case No. 2004-K-1161).

[31]State v. Rhodes, 883 So.2d 1042, No. 2004-K-1161 (La. 2004); State Record Vol. 5 of 9.

[32]State Record Vol. 1 of 9 (docket master entry, p. 3).

[33]State Record Vol. 6 of 9 (Application for Post Conviction Relief).

biased.[34]  In a November 30, 2007 hearing, the trial court heard testimony from trial counsel and Rhodes.[35]  At this hearing, counsel asked the State to provide him with the "D.A. file in connection with this matter."  The assistant district attorney had no objection to counsel's request, but explained that he did not have the file with him at the hearing.[36]  On April 22, 2008, the state trial court denied Rhodes post-conviction relief.[37]

On August 27, 2008, the Louisiana Fourth Circuit Court of Appeal denied Rhodes's related post-conviction writ application.  The state appellate court found no merit in Rhodes's claims that his counsel was ineffective due to her failure to have hearsay and testimony regarding the recovered shotgun suppressed or to object to Abed's testimony.  The Fourth Circuit also found Rhodes's claims that his sentence was excessive and that the trial judge was biased procedurally barred as untimely.[38]

On September 26, 2008, Rhodes's counsel filed a writ application in the Louisiana Supreme Court asserting claims that his trial counsel had been ineffective for failing to have hearsay and testimony regarding the recovered shotgun suppressed and to object to

---

[34]Id. (Motion to Recuse).

[35]State Record Vol. 6 of 9 (Post-Conviction Hearing, 11/30/07, pp. 1-2).

[36]Id. at pp. 20-21.

[37]Id. (Transcript, 4/22/08, p. 13). In a November 25, 2008 letter, the assistant district attorney noted that he had informed Rhodes's counsel before the trial court's April 22, 2008 ruling that he could not locate the district attorney's file concerning Rhodes's case. State Record Vol. 8 of 9.

[38]State v. Rhodes, Case No. 2008-K-0797 (La. App. 4th Cir. 8/27/08); State Record Vol. 6 of 9.

witness Abed's testimony, and that Rhodes had received an excessive sentence.[39]  On November 20, 2009, the Louisiana Supreme Court deferred ruling on Rhodes's claims, providing him "with an opportunity to supplement his claim[s] in the district court and to obtain a ruling on the claim[s] as supplemented."[40]

On December 18, 2009, Rhodes filed a pro se supplemental post-conviction application in the trial court.  Rather than supplementing his existing claims, however, Rhodes asserted the following claims:  (1) The State withheld exculpatory evidence and suborned perjury.  (2) His counsel was ineffective in failing to use the victim's medical records to impeach the victim's testimony.[41]  On March 4, 2010, the state trial court denied Rhodes's post-conviction application as untimely under La. Code Crim. P. art. 930.8 and as repetitive under La. Code Crim. P. art. 930.4.[42]

---

[39]State v. Rhodes, Case No. 2008-KP-2348; State Record Vol. 7 of 9. While his supreme court post-conviction writ application was pending, Rhodes filed a pro se application for a writ of mandamus in the state appellate court seeking to compel production of the "District Attorney's file." State v. Rhodes, Case No. 2007-K-0040; State Record Vol. 8 of 9. On February 18, 2009, the state appellate court denied Rhodes's writ application. State v. Rhodes, Case No. 2009-K-0040 (La. App. 4th Cir. 2/18/09); State Record Vol. 8 of 9. Rhodes then filed an application for a writ of mandamus in the Louisiana Supreme Court, seeking to compel production of the district attorney's file. The Louisiana Supreme Court denied Rhodes's application without opinion. State ex rel. Rhodes v. State, 45 So.3d 1085, Case No. 2009-KH-0785 (La. 2009); State Record Vol. 8 of 9.

[40]State v. Rhodes, 25 So.3d 781 (La. 2009), Case No. 2008-KP-2348; State Record Vol. 7 of 9 (emphasis added).

[41]State Record Vol. 8 of 9.

[42]Id.

On May 26, 2010, the Louisiana Fourth Circuit denied Rhodes's related writ application, stating: "In its judgment, the district court denied the claims in relator's application and supplement as not timely filed and repetitive.  La. C. Cr. P. art. 930.8 and La. C. Cr. P. art. 930.4.  There is no error in the district court's March 4, 2010 judgment."[43]  Shortly thereafter, Rhodes again requested relief from the Louisiana Fourth Circuit, which the appellate court denied, stating:  "Relator again requests review of the district court's judgment of March 4, 2010 denying post-conviction relief.  This Court previously found no error in the trial court's judgment in writ 2010-K-0712.  Relator's claim is repetitive.  La. Code Crim. P. art. 930.4.  Accordingly, relator's application is denied."[44]  On September 28, 2010, the Louisiana Supreme Court denied Rhodes post-conviction relief without opinion.[45]

On April 27, 2010, while his post-conviction writ application was pending before the Louisiana Supreme Court, Rhodes filed a motion for production of documents in the state trial court, seeking production of the transcript of a bench conference between the trial judge and the jury foreperson.[46]  Having received no response to his motion, Rhodes filed an application for a writ of mandamus in the Louisiana Fourth Circuit on July 13,

---

[43]State v. Rhodes, Case No. 2010-K-0712 (La. App. 4th Cir. 5/26/10); State Record Vol. 8 of 9.

[44]State v. Rhodes, Case No. 2010-K-0782 (La. App. 4th Cir. 7/1/10); State Record Vol. 8 of 9.

[45]State v. Rhodes, 45 So.3d 1085, Case No. 2008-KP-2348 (La. 2010); State Record Vol. 7 of 9.

[46]Record Doc. No. 7-1, p. 21.

2010, seeking an order to the trial court to provide him with the requested transcript.[47]

The Louisiana Fourth Circuit granted Rhodes's application and ordered the district court

to provide either the transcript or notification that the transcript does not exist.[48]   On

August 25, 2010, the trial court denied Rhodes's motion for production of the transcript,

advising that no transcript exists of the conversation between the jury foreperson and the

judge.[49]

On September 22, 2010, Rhodes filed a writ application in the Louisiana Fourth

Circuit complaining that he was denied his right to meaningful appellate review because

of the absence of the transcript.[50]   On October 6, 2010, the Louisiana Fourth Circuit

denied Rhodes's writ application, determining that he was not entitled to relief pursuant

to La. Code Crim. P. art. 930.2 and that his claims had prescribed pursuant to La. Code

Crim. P. art. 930.8.[51]   On November 15, 2010, Rhodes filed a writ application with the

trial court, again asserting that he was denied meaningful review and that his claim was

---

[47]State v. Rhodes, Case No. 2010-K-1071; State Record Vol. 9 of 9.

[48]State v. Rhodes, Case No. 2010-K-1071 (La. App. 4th Cir. 8/16/10); State Record Vol. 9 of 9.

[49]State Record Vol. 9 of 9.

[50]State v. Rhodes, Case No. 2010-K-1364; State Record Vol. 9 of 9.

[51]State v. Rhodes, Case No. 2010-K-1364 (La. App. 4th Cir. 10/6/10); State Record Vol. 9 of 9. Rhodes did not seek relief from the Louisiana Supreme Court.

timely.[52]  The trial court never ruled on the writ application, and Rhodes did not seek mandamus relief.

Rhodes then filed a motion to recuse the trial judge, arguing that because the bench conference between the jury foreperson and the trial judge was not transcribed, the trial judge should recuse himself because he would necessarily be a witness in a hearing to ascertain what was said in the bench conference.[53]  On November 29, 2010, the trial court denied Rhodes's motion to recuse.[54]  On December 27, 2010, Rhodes filed a writ application with the Louisiana Fourth Circuit seeking relief from the trial court's denial of his motion to recuse.[55]  On January 13, 2011, the Louisiana Fourth Circuit denied relief.[56]  On December 16, 2011, the Louisiana Supreme Court denied Rhodes's writ application without opinion.[57]

---

[52]State Record Vol. 9 of 9.

[53]State Record Vol. 9 of 9. The copy of Rhodes's motion to recuse in the state court record is not dated and is not file-stamped.

[54]State Record Vol. 9 of 9.

[55]State v. Rhodes, Case No. 2011-K-0015; State Record Vol. 9 of 9.

[56]State v. Rhodes, Case No. 2011-K-0015 (La. App. 4th Cir. 1/13/11); State Record Vol. 9 of 9.

[57]State ex rel. Rhodes v. State, 76 So.3d 1196, Case No. 2011-KH-0299 (La. 2011); State Record Vol. 9 of 9.

(B)   <u>FEDERAL HABEAS PETITION</u>

On February 16, 2011, the clerk of this court filed Rhodes's original petition for federal habeas corpus relief in which he asserted two claims: (1) The State withheld exculpatory evidence; specifically, the victim's medical records, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); and knowingly allowed the victim to offer false testimony in violation of <u>Napue v. Illinois</u>, 360 U.S. 264 (1959).  After filing his original petition, however, Rhodes voluntarily dismissed the "<u>Brady</u> aspect" of his claim, conceding that it "has no merit" and, therefore, I "will withdraw [it]."[58]  (2) He received ineffective assistance of counsel at trial because his counsel failed to use medical records to impeach the victim's testimony and failed properly to cross-examine or impeach witness Basem Abed and move for a recess or continuance due to the absence of an interpreter.[59]

On March 9, 2011, Rhodes filed a motion to amend or supplement his petition and to hold the petition in abeyance pending exhaustion of his state court writ application, Case No. 2011-KH-0299, then pending before the Louisiana Supreme Court.[60]  On June

---

[58]Record Doc. No. 22, p. 1. Accordingly, Rhodes's <u>Brady</u> claim will not be addressed by this court.

[59]In his original memorandum, the focus of Rhodes's argument is that trial counsel failed properly to cross-examine Abed. Record Doc. No. 1-1, pp. 26-32. In his traverse, Rhodes focuses on counsel's failure to seek a recess or continuance due to the absence of an interpreter. Record Doc. 22, pp. 5-6.

[60]Record Doc. No. 7.

29, 2011, Rhodes's motion to amend and stay those proceedings was granted by the presiding district judge upon recommendation of the now-retired magistrate judge previously assigned to this case.[61]  On January 18, 2012, Rhodes advised this court that the Louisiana Supreme Court had denied his pending writ application about a month earlier, and that his state court remedies were exhausted, and he filed a motion to reopen and amend or supplement his Section 2254 petition.[62]  On April 3, 2012, Rhodes's motion was granted by the presiding district judge.[63]

In his supplemental petition, Rhodes asserts two additional claims:  (3) He was denied his right to adequate review and his right to counsel at a critical stage of proceedings due to an ex parte and un-transcribed bench conference between the trial judge and the jury foreperson.  (4) The trial judge erred in not recusing himself.[64]

Thus, in summary, Rhodes asserts a total of four kinds of claims in this court: (1) Napue subornation of perjury, (2) ineffective assistance of trial counsel, (3) an ex parte, untranscribed bench conference with juror, and (4) trial judge recusal.

---

[61]Record Doc. Nos. 11 and 12.

[62]Record Doc. No. 13.

[63]Record Doc. No. 14.

[64]Record Doc. Nos. 13 and 15.

The State filed a response[65] in opposition to Rhodes's petition, conceding that the instant matter was timely filed.[66]  The State asserts that Rhodes's <u>Napue</u> claim and his claim that his counsel was ineffective in failing to use documents to impeach the victim's testimony are procedurally barred and his claims are otherwise without merit.  Rhodes filed a traverse,[67] and the State filed a supplemental response[68] and an additional brief in response to my order upon remand from the district judge.[69]

(C)   <u>THRESHOLD STANDARDS OF REVIEW</u>

The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[70] and applies to habeas petitions filed after that date.  <u>Flanagan v. Johnson</u>, 154 F.3d 196, 198 (5th Cir. 1998) (citing <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997)).  The AEDPA therefore applies to

---

[65]Record Doc. No. 21.

[66]<u>Id</u>. at p. 8.

[67]Record Doc. No. 22.

[68]Record Doc. No. 25.

[69]Record Doc. No. 33.

[70]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. <u>United States v. Sherrod</u>, 964 F.2d 1501, 1505 (5th Cir. 1992).

Rhodes's petition, which, for reasons discussed below, is deemed filed in this federal court on January 25, 2011.[71]

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c).

The State concedes that Rhodes's habeas petition is timely.  The State also appears to concede that Rhodes has exhausted his state court remedies.[72]  The State continues to assert, however, that claim (1), that the State knowingly suborned perjured testimony, and a portion of claim (2), that counsel was ineffective in failing to utilize medical

---

[71]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). Rhodes dated his signature on the petition on January 25, 2011. Record Doc. No. 1-1, p. 36. This is the earliest date appearing in the record on which he could have delivered his pleadings to prison officials for mailing.

[72]With regard to claim (3) concerning the untranscribed bench conference between the judge and a juror, the State asserts that the claim was presented to the Louisiana Fourth Circuit via an exhibit attached to his writ application, thereby "rendering it exhausted." Record Doc. No. 21, pp. 30-31. The State's position in this regard is arguably contrary to the Supreme Court's holding in Baldwin v. Reese, 541 U.S. 27, 32 (2004) (a prisoner does not fairly present a claim to a state court if that court must read beyond a petition or brief, such as a lower court opinion, to find the claim). This issue, however, need not be addressed since I find that claim (3) is without merit and therefore may be determined on the merits without the requirement of full exhaustion. 28 U.S.C. § 2254(b)(2).

records to impeach the victim, are procedurally barred, a position with which I have previously agreed.

As directed in the district judge's referral order and for the reasons outlined above, however, I will not again address the State's procedural default arguments, but instead address the substance of all of Rhodes's claims on the merits.

(D)    MERITS REVIEW LEGAL STANDARDS

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings.  Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), cert. denied, 532 U.S. 1039 (2001).  The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state

court's decision "'was contrary to, or involved an unreasonable application of, clearly

established [Supreme Court precedent.]'" <u>Penry v. Johnson</u>, 215 F.3d 504, 507 (5th Cir.

2000) (quoting <u>Miller v. Johnson</u>, 200 F.3d 274, 280-81 (5th Cir.), <u>cert</u>. <u>denied</u>, 531 U.S.

849 (2000)), <u>aff'd in part, rev'd in part on other grounds</u>, 532 U.S. 782 (2001); <u>Hill</u>, 210

F.3d at 485.   The United States Supreme Court has clarified the Section 2254(d)(1)

standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> Court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts. Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

<u>Williams v. Taylor</u>, 529 U.S. 362, 405-06, 412-13 (2000); <u>Penry</u>, 532 U.S. at 792-93;

<u>Hill</u>, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the state court decision applied [a

Supreme Court case] incorrectly.'" <u>Price v. Vincent</u>, 538 U.S. 634, 641 (2003) (quoting

<u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002)) (brackets in original); <u>Bell v. Cone</u>,

535 U.S. 685, 699 (2002).  Rather, under the "unreasonable application" standard, "the

only question for a federal habeas court is whether the state court's determination is

objectively unreasonable."  <u>Neal v. Puckett</u>, 286 F.3d 230, 246 (5th Cir. 2002), <u>cert</u>.

<u>denied</u>, <u>sub nom</u>, <u>Neal v. Epps</u>, 537 U.S. 1104 (2003). The burden is on the petitioner to

show that the state court applied the precedent to the facts of his case in an objectively

unreasonable manner.  Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25);

Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

(E)    ANALYSIS OF PETITIONER'S CLAIMS

(1)    SUBORNED PERJURY

Rhodes argues that the State knowingly suborned perjury from the victim, David

Blohm, in violation of Napue v. Illinois, 360 U.S. 264 (1959), by allowing the victim to

testify, contrary to his medical records, that he was not on medication while hospitalized

at the time he first identified Rhodes as the perpetrator.  One of his other arguments

addressed below – i.e., that his trial counsel was ineffective in failing to use the victim's

medical records to impeach the victim's testimony[73] – is factually related to this claim.

The state trial court denied this claim in post-conviction proceedings on procedural

grounds, and the state appellate court expressly upheld that dismissal  The Louisiana

Supreme Court then denied writs.

A claim of prosecutorial misconduct, including use of perjured testimony, presents

a mixed question of law and fact.  Brazley v. Cain, 35 F. App'x 390, 2002 WL 760471,

at *4 n.4 (5th Cir. Apr. 16, 2002) (citing United States v. Emueqbunam, 268 F.3d 377,

---

[73]As noted above at p. 2 n. 3 and p. 16, Rhodes has abandoned his claim that the State failed to
provide the defense with the victim's medical records in violation of Brady. It is clear, as discussed in
footnote 3 above, that the medical records were, in fact, provided.

403-04 (6th Cir. 2001); Jones v. Gibson, 206 F.3d 946, 958 (10th Cir. 2000); United

States v. Noriega, 117 F.3d 1206, 1218 (11th Cir. 1997); United States v. Spillone, 879

F.2d 514, 520 (9th Cir. 1989)).  This court must determine whether the state courts'

rulings were contrary to or an unreasonable application of federal law.

A state denies a criminal defendant due process when it knowingly uses perjured

testimony at trial or allows untrue testimony to go uncorrected.  Giglio v. United States,

405 U.S. 150, 766 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959); Faulder v.

Johnson, 81 F.3d 515, 519 (5th Cir. 1996).  To obtain relief, the defendant must show

that (1) the testimony was actually false, (2) the State knew it was false, and (3) the

testimony was material.  Duncan v. Cockrell, 2003 WL 21545926, at*3 (5th Cir. July 3,

2003); Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993).  False testimony is

"material" only if there is any reasonable likelihood that it could have affected the jury's

verdict.  Duncan, 2003 WL 21545926, at*3 (citing Nobles, 127 F.3d at 415).

For the following reasons, I find that Rhodes's argument in this regard is without

merit because the medical records do not indicate that Blohm actually took any

medications on June 25, 2002, the day he initially identified Rhodes in the photo lineup.

The thrust of Rhodes's arguments on this claim is that the trial testimony of the

victim Blohm that he was not taking medication on the day of Blohm's initial

identification of Rhodes so conflicted with the evidence of his medication in his arrest

23

and medical records that the State must have known the trial testimony was false.  On

June 25, 2002, while the victim, David Blohm, was hospitalized six (6) days after

suffering a gunshot wound in the robbery, he was presented with a photographic lineup.[74]

For the first time, Blohm identified Rhodes as the gunman from this lineup.[75]  On cross-

examination, Blohm was asked about this initial identification of Rhodes and testified in

pertinent part as follows:

> Q.   Okay. And when you make the identification of Troy Rhodes,
> obviously you were still in the hospital. Were you taking any pain
> medication at that time?
> A.  I don't think I was, ma'am.
> Q.  This would have been on the - - on June 25th, about six days, five days
> after the incident?
> A.  No, ma'am, I was not on anything at that time?
> Q.  You were not on any pain medication at that time?
> A.  (Witness shakes head negatively.)[76]

The victim's medical records, which were admitted into evidence at trial as

Exhibit 17, indicate that shortly after he was shot, when Blohm was post-operative early

in his hospitalization, the victim's doctors prescribed pain and sedative medications

acetaminophen/oxycodone, morphine sulfate and Promethazin HCL.[77]  However, the

---

[74]State Record Vol. 4 of 9, p. 241.

[75]Id.

[76]State Record Vol. 4 of 9, p. 311.

[77]Record Doc. No. 1-5, pp. 74-75. Acetaminophen/oxycodone, also known as Percocet, is a combination of oxycodone, an opioid pain reliever, and acetaminophen, a less potent pain reliever that increases the effects of oxycodone. Percocet is used to relieve moderate to severe pain. Drugs.com (rev. 11/5/13), http://www.drugs.com/percocet.html (visited Jan. 3, 2014).  Morphine sulfate, also known as

medical records, particularly the two (2) pages of Medical Center of Louisiana "Medication Administration Record," show only that Blohm was actually given these and other prescribed medicines, on June 23 and 24, 2002, not on June 25, 2002, the day he identified Rhodes in the photo lineup.[78]

Specifically, as reflected at the top of the first form marked "Page: 2 of 2," by the printed dates and times that appear over, through, below and to the right of the word "Record," the notations on this form note the precise times that the listed medications were actually administered to Blohm from one minute past midnight June 23, 2002 through the end of that day, midnight June 23, 2002.[79] The "start" and "stop" columns on the left side of the form indicate the dates during which these medications were prescribed for use, not the actual administration dates. This form reflects that all of these medications were prescribed beginning on June 22, with varying "stop" dates for the prescriptions. The precise times of actual administration of the drugs is recorded in the

---

Avinza, is "intended for once-daily administration to relieve moderate to severe chronic (long term) pain that requires continuous, around-the-clock opioid therapy for a long period of time." PDRhealth (PDR Network, LLC 2014), http://www.pdrhealth.com/drugs/avinza (visited Jan. 3, 2014). Promethazin HCL, also known as Phenergan (generic name: promethazine), "is an antihistamine. It blocks the effects of the naturally occurring chemical histamine in your body. Phenergan is used to treat allergy symptoms such as itching, runny nose, sneezing, itchy or watery eyes, hives, and itchy skin rashes. Phenergan also prevents motion sickness, and treats nausea and vomiting or pain after surgery. It is also used as a sedative or sleep aid." Drugs.com (rev. 4/12/2009), http://www.drugs.com/phenergan.html (visited Jan. 3, 2014).

[78]Id. at pp. 74-75. The medication administration and other medical records of the victim are also in State Record Vol. 8 of 9.

[79]Record Doc. No. 1-5, p. 74 of 77; Medical records in State Record Vol. 8 of 9.

three right-hand columns of the form, all on June 23, 2002.[80]  Similarly, the second form

marked "Page: 1 of 1" reflects actual administration of these drugs to Blohm from one

minute past midnight on June 24, 2002 through the end of that day, midnight June 24,

2002, with the precise times of actual administration of the medications in the three right-

hand columns, all on June 24th.[81] Significantly, the notations in the "medication" column

of this form next to acetaminophen/oxycodone and morphine sulfate both state "stops in

48 hours," indicating an end to administration of these drugs on June 24, 2002, 48 hours

after they were first prescribed on June 22nd.[82] In addition, the "authorized signature" of

the medication administrator at the bottom of this form is dated June 24, 2002.[83]

Consistently with Blohm's testimony and the indications in the "Doctors Order

Form[s]" discussed below, the medical records do not include any Medication

Administration Record for June 25, 2002, or any other notation that Blohm actually was

administered these medications on June 25, 2002, the date he first identified Rhodes in

the photo lineup.

The combined effect on Blohm of his injuries, his need for surgery and these drugs

in the first few days of hospitalization, before he identified Rhodes as his attacker on

---

[80]Id.

[81]Record Doc. No. 1-5, pp. 75 of 77; Medical records in State Record Vol. 8 of 9.

[82]Id.

[83]Id.

June 25, 2002, is reflected in the trial transcript.  Lt. Christy Williams, an investigating police officer, testified that when she attempted to interview Blohm in the hospital on June 19, 2002, the day of the shooting, she was turned away by a nurse because Blohm was in no condition to speak to the officer.[84]

Lt. Williams testified that it was not until three days later, on June 22, 2002, that she was first able to see Blohm in the hospital and show him a photo lineup of suspects that did not include Rhodes.[85] She described Blohm on that day as "very ill . . . not his best day" and in "guarded" condition, but coherent.[86] Asked if Blohm told her he was on pain medication that day, Lt. Williams said, "I don't remember if he did or not. He probably was would be my guess, but I'm not sure."[87] She testified that Blohm did not identify anyone in this photo lineup as the perpetrator on June 22nd.[88]

Lt. Williams then testified that she next attempted to show Blohm another photo lineup that again did not include Rhodes two days later, on June 24, 2002, but Blohm did

---

[84]State Record Vol. 4 of 9 (trial transcript at p. 21, lines 1-8).

[85]Id. (trial transcript at pp. 21-23).

[86]Id. (trial transcript at p. 22).

[87]Id. (trial transcript at p. 23, lines 5-7).

[88]Id. (trial transcript at pp. 24, lines 5-7).

not review it because "he was too sick, he just told me that he wasn't feeling well and just couldn't look at it, so I had to leave."[89]

All of the foregoing occurred <u>before</u> Blohm first identified Rhodes as the shooter on June 25, 2002. However, Rhodes's argument concerning Blohm's alleged perjury and the State's subornation must necessarily focus on Blohm's condition and medications <u>on June 25, 2002</u>, when Blohm first identified Rhodes as the gunman who shot him.

Rhodes requested in his recent motion for an evidentiary hearing that this court focus on two "Doctors Order Form[s]" in Blohm's hospital medical records for June 25, 2002, which are part of trial Exhibit 17 and which Rhodes has copied and attached to his pleadings "for the convenience of the court." Contrary to Rhodes's argument, these records, particularly when compared to the police report he also relies upon, do <u>not</u> support a finding that Blohm's testimony was <u>actually</u> false and that the state <u>knew</u> it was false. The police report indicates that Blohm made his photo lineup identification of Rhodes late in the afternoon of June 25th, at 5:52 p.m. Record Doc. No. 32 at p. 8.

The June 25th Doctors Order Forms include the following notations concerning Blohm's medications and conditions on June 25, 2002, the day he made his initial identification of Rhodes: In chronological terms, the first of the two doctors order forms

---

[89]<u>Id.</u> (trial transcript at pp. 24, lines 12-18).

28

was written at 6:45 a.m., almost twelve hours before Blohm made his identification.[90] It

indicates that Blohm's condition that day, the sixth day of his hospitalization, had

improved to the point that he was classified as "stable," with activity permitted "as

tolerated," and "transfer from SICU [Surgical intensive care unit] to [a regular hospital]

floor" also noted.[91]  This doctors order form lists four prescribed medications.  Two were

Phenergan and Pepcid, which are principally used for post-surgical nausea and digestive

system irritation that might be expected to be used to treat a patient like Blohm, who had

suffered an abdominal area gunshot wound.[92]  This form also indicates that two pain

medications, Percocet and "MSO" (morphine sulphate), were prescribed, but the Percocet

only as needed and the MSO only to "break through pain," if necessary.[93]

    The second of the two doctors order forms relied upon by Rhodes was written later

in the day on June 25th, at 3:46 p.m., about two hours before Blohm first identified

Rhodes in the photo lineup.[94]  It shows further improvement in Blohm's medical

---

[90]Record Doc. No. 32 at p. 11 of 11.

[91]Id.

[92]Pepcid (generic name: famotidine) "is a histamine-2 blocker. It works by decreasing the amount of acid the stomach produces. Famotidine is used to treat and prevent ulcers in the stomach and intestines. It also treats conditions in which the stomach produces too much acid, such as Zollinger-Ellison syndrome. Famotidine also treats gastroesophageal reflux disease (GERD) and other conditions in which acid backs up from the stomach into the esophagus, causing heartburn." Drugs.com (rev. 9/12/2011), http://www.drugs.com/famotidine.html (visited Jan. 3, 2014).

[93]Record Doc. No. 32 at p. 11 of 11.

[94]Record Doc. No. 32 at p. 10 of 11.

condition in two significant respects.  First, it notes "transfer to Slidell Memorial," indicating that Blohm's condition had improved to the point that he was then capable of tolerating a trip of about 30 miles from the LSU hospital in New Orleans, where he was then being treated, to a hospital in Slidell, Louisiana. Second, the form no longer contained a prescription for MSO (morphine sulfate), indicating no further need at that point to "break through pain."  Percocet for pain continued to be <u>prescribed</u>, but again only as needed, along with Phenergan and Pepcid for nausea and digestive upset, as needed.

Neither of these doctors order forms, which Rhodes has specifically pointed out to the court, indicates actual administration of either Percocet or MSO on June 25, 2002. When considered together with the medication administration records discussed above, there is much more in the medical records to support the view that Blohm actually received medications earlier in his hospitalization, but <u>not</u> on June 25, 2002, as he testified.

It is the patient – not the prescribing physician – who determines if he has pain necessitating actually taking pain medication prescribed for use only as needed.  Blohm, the patient and person in the best position to know, testified that he was not taking medication at the time he identified Rhodes in the photo lineup at 5:52 p.m. on June 25th. On cross-examination at trial, he rebuffed all of defense counsel's various other attempts

to challenge his ability to make an accurate identification on that date[95] and reiterated that he was "a hundred percent" positive of his identifications of Rhodes as the gunman during the photo lineup on June 25th; in person at a pretrial evidentiary hearing and again in person at the trial itself.[96] The medical records <u>support</u> Blohm's testimony much more than they provide any basis for impeachment.

Blohm's testimony that his ability on June 25, 2002, to identify Rhodes accurately as his assailant, without impairment that might have been caused by medication, was not undermined by the medical records of that date and was corroborated in the description of his cognitive state provided in the trial testimony of Lt. Williams. On cross-examination, Williams stated that Blohm was in no way "hesitant" in making his photo lineup identification; that he "honestly believed that [Rhodes] was the person" who "robbed and shot him: and that "I don't think [Blohm] had any reason . . . to doubt himself . . . he knew exactly who he was identifying."[97]

Rhodes has not established that Blohm's testimony was actually false in any way or that the prosecution knew it was false.  This argument is based on Rhodes's speculation that it was false, despite the fact that both the medical records and the testimony of Lt. Williams provide ample corroborative evidence from which the jury, in

---

[95]State Record Vol. 4 of 9 (trial transcript at pp. 86-91, 93-95).

[96]<u>Id.</u> at pp. 81-83, 97-98.

[97]<u>Id.</u> at pp. 42-43.

its capacity as ultimate factfinder and judges of witness credibility, could conclude that Blohm's testimony concerning his medications was credible.

The medical records concerning the pain medication that Blohm <u>could</u> have taken if needed provided only the thinnest basis on which it might have been argued that his testimony was inconsistent with the records. However, the mere possibility of conflict in evidence does not render the testimony actually false or perjured. <u>See</u> <u>United States v. Wall</u>, 389 F.3d 457, 473 (5th Cir. 2004), <u>cert. denied</u>, 544 U.S. 978 (2005) ("Wall has not established that McDowell's testimony was actually false. He has merely shown that Ristau's testimony would establish a conflict in the testimony, a far cry from showing that it was 'actually false.'").

Rhodes cannot establish that the victim lied or that the State knew that the victim did not tell the truth at trial. The medical records do not undermine Blohm's testimony. Blohm's identification of Rhodes as the armed robber who shot him was consistent both before and during trial and would not have given the prosecutor reason to consider it false. For all of the foregoing reasons, Rhodes has failed to establish that the state courts' denial of relief on this claim was contrary to or an unreasonable application of Supreme Court precedent. He is not entitled to relief on this claim.

(2)      INEFFECTIVE ASSISTANCE OF COUNSEL

Rhodes argues that his trial counsel was ineffective in two respects.  First, he argues that his counsel failed to use the victim's medical records to impeach his testimony identifying Rhodes as the perpetrator.  Second, he argues that his trial counsel was ineffective in cross-examining trial witness Basem Abed and failing to seek a continuance in the absence of an interpreter to clarify Abed's testimony.

The standard for judging performance of counsel was established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), in which the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice.  Strickland, 466 U.S. at 697 (emphasis added).  The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687–88.  Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir.1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.  Kimler, 167 F.3d

at 893.  A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' . . . But it is not enough under Strickland, however, 'that the errors had some conceivable effect on the outcome of the proceeding.'" Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir.1994) (quoting Strickland, 466 U.S. at 693); Harrington v. Richter, _ U.S. _, 131 S.Ct. 770, 792 (2011) (Strickland requires a "substantial" likelihood of a different result, not just a "conceivable" one.)

On habeas review, the United States Supreme Court has recently clarified that, under Strickland, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington, 131 S.Ct. at 788.  The Harrington Court went on to recognize the high level of deference owed to a state court's findings under Strickland in light of the AEDPA:

> The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.  The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

"A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of

hindsight." Bell v. Cone, 535 U.S. 685, 697 (2002) (citing Strickland, 466 U.S. at 689). A "'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'" Johnson v. Dretke, 394 F.3d 332, 337 (5th Cir. 2004) (quoting United States v. Jones, 287 F.3d 325, 331 (5th Cir. 2002)); see also Jones, 287 F.3d at 331 ("Informed strategic decisions of counsel are given a heavy measure of deference and should not be second guessed." (quotation omitted)); Geiger v. Cain, 540 F.3d 303, 309 (5th Cir. 2008) (same). Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. Strickland, 466 U.S. at 689; Moore, 194 F.3d at 591.

The issue of ineffective assistance of counsel is a mixed question of law and fact. Woodfox v. Cain, 609 F.3d 774, 789 (5th Cir. 2010); Richards v. Quarterman, 566 F.3d 553, 561 (5th Cir. 2009).

Rhodes first asserts that his counsel was ineffective due to her failure to use the victim's medical records to impeach the victim's testimony. Specifically, he argues that his counsel failed to use the medical records to impeach the reliability of the victim's photographic line-up initial identification of Rhodes as the man who robbed and shot him.

As discussed above, Blohm's medical records reflect that Blohm was <u>prescribed</u> various medications, but they do not establish that he was actually taking any medications on June 25, 2002. Counsel did not ask Blohm about these medication records to impeach his testimony that he was not taking any medication at the time he identified Rhodes. Because – as discussed above – the medical records tend to corroborate Blohm's testimony and do not undermine it, I find that Rhodes's counsel was <u>not</u> deficient in failing to use the medication records in her cross-examination of Blohm. In addition, Rhodes was <u>not</u> prejudiced as a result of counsel's performance in this regard.

Concerning counsel's performance, as discussed above, the medical records relied upon by Rhodes do not provide a basis on which the victim might have been impeached. They do not establish that Blohm was actually under the influence of pain medication at the time of the initial identification, but only that they had been prescribed for his use as needed.  The same records establish that Blohm's condition had improved by June 25th to "stable;" that he could engage in any activity that he could tolerate; and that he was well enough to be removed from surgical intensive care and transferred to a hospital 30 miles away. The medication administration records establish that he actually took medications on June 23 and 24, 2002, but <u>not</u> on June 25, 2002.

Even if Blohm was taking the prescribed medications, the records do not indicate that his memory or other cognitive abilities would have been inhibited in any way by June 25, 2002, such as to render the identification unreliable. Other credible evidence, including Lt. Williams's testimony, indicates that Blohm was not visibly suffering any deleterious effects from medication on the day he made the identification, which the officer described as certain, clear and reliable.

In addition, the trial transcript establishes that defense counsel made vigorous efforts throughout her presentation before the jury to challenge the veracity of Blohm's identification of Rhodes as the gunman in other ways.  Rather than rely on the medical records, the use of which may well have undermined her impeachment efforts for the reasons discussed above, she chose to attack the victim's identification in other ways she thought would be more effective, apparently in the exercise of professional strategy and judgment.

In her opening statement, defense counsel argued that Blohm "was understandably very excited, very nervous, very scared, upset" by the armed robbery and shooting and "that highly charged atmosphere" raised questions about his "credibility with regard to [his] identification" of Rhodes.[98]  Through her cross-examination of both Lt. Williams and Blohm, defense counsel emphasized the "varying" nature and certain inconsistencies

---

[98]Id. at pp. 6-7.

37

in the physical descriptions of the perpetrator initially provided to investigating officers;[99] that Blohm did not have his eyeglasses on the first few occasions when he was asked to view photo lineups;[100] that Lt. Williams thought Blohm "probably was" on pain medication when she first interviewed him on June 22, 2002;[101] that there were "several variances" in the descriptions that Blohm gave;[102] and that Blohm's physical description of his assailant was not "explicit" and lacked detail.[103] Her efforts to undermine Blohm's identification of Rhodes in these ways would have been undermined by highlighting medical records that provided support for the opposite view that Blohm was not taking medication and that his condition had improved sufficiently by June 25, 2002, his sixth day in the hospital, to provide a reliable identification. The fact that defense counsel's strategic choices in this regard apparently were not successful in persuading the jury to disregard Blohm's identification does not render her performance constitutionally deficient.

As to prejudice, the usefulness of the June 25, 2002 medical records for impeachment purposes to the case as a whole was so minimal that it cannot be concluded

---

[99]Id. at pp. 33-36.

[100]Id. at pp. 32, 36.

[101]Id. at pp. 23.

[102]Id. at p. 111.

[103]Id. at p. 112.

that highlighting of the records by defense counsel probably would have resulted in a different trial outcome.  The medical records were in fact introduced in evidence and provided to the jury for their use.  As discussed above, the medical records supported conclusions different from the one suggested by Rhodes and did <u>not</u> support Rhodes's argument that Blohm's identification on June 25, 2002 was not reliable.

Blohm's overall identification of Rhodes as the man who robbed and shot him was strong.  Blohm testified that the incident occurred between 10 and 11 in the morning on a "nice sunny day."[104]  He stated that when Rhodes entered his delivery truck, they were only two to three feet away from each other.  Blohm admitted that some of his concentration was centered on the shotgun pointing at him, but mostly he was looking at Rhodes.[105]  Blohm stated that after exiting the truck, he was only about five feet away from Rhodes and again got a good look at his assailant.[106]  As for the photographic lineup, Blohm testified that he was "[a] hundred percent" certain that Rhodes was the man who shot and robbed him.[107]  Blohm stated that he had also recognized Rhodes as the gunman at a pretrial evidentiary hearing, and when he saw Rhodes in person in the

---

[104]State Record Vol. 4  of 9 (trial transcript at pp. 73, 77).

[105]<u>Id</u>. at p. 78.

[106]<u>Id</u>.

[107]<u>Id</u>. at p. 81.

courtroom at trial, he was "a hundred-and-ten percent" certain that his identification of Rhodes was correct.[108]

In addition to Blohm's identification, the prosecution also submitted other substantial evidence of Rhodes's guilt, including the testimony of other witnesses and the results of a police investigation that located the shotgun used in the armed robbery hidden under a house located "at one of the addresses that Troy Rhodes had recently given . . . ."[109]

To establish prejudice, Rhodes "'must show that there is at least a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Henderson v. Cockrell, 333 F.3d 592, 599 (5th Cir. 2003), cert. denied, 540 U.S. 1163 (2004) (quoting Neal v. Puckett, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) (additional quotation omitted). Given the strength of Blohm's identification of Rhodes as the perpetrator, the jury's awareness of Blohm's medical condition, and the lack of support in the medical records for Rhodes's speculation that Blohm was on medication at the time of the photographic lineup identification on June 25th, I find that it is not reasonably probable that the result of the proceeding would have been different if counsel had used Blohm's medical records for impeachment purposes.

---

[108]Id.

[109]Id. at pp. 29-31.

As to Basem Abed's testimony, Rhodes asserts that his counsel was ineffective due to her failure to reurge claims that much of Abed's testimony should be suppressed. As discussed above, the trial judge, in ruling on defense counsel's motion, initially suppressed Abed's statements that he saw Rhodes 30 to 45 minutes before the incident and saw him again two or three days after the incident and had a conversation with him about who shot the victim. Later, the judge reversed himself and ruled that Abed's testimony in this regard was admissible.

Rhodes makes no showing as to what new arguments counsel could have presented to sway the judge to once again reverse himself and decide to suppress the testimony. Stated differently, Rhodes provides nothing to suggest that it would not have been futile for his counsel to try again to persuade the trial judge to change his mind a second time and reinstate his original ruling. Counsel cannot be ineffective for failing to pursue a futile course of action. United States v. Manley, 2011 WL 2259761, *3 (E.D.Pa.2011); see Lindsey v. Cain, 267 Fed. Appx. 374, *1 (5th Cir.2008) (counsel is not ineffective by failing to raise futile claims) (citing Johnson v. Cockrell, 306 F.3d 249, 255 (5th Cir. 2002)). Counsel made every effort to suppress Abed's testimony and succeeded in doing so on her first attempt. The judge's later change of mind cannot be attributed to any deficient performance on her part.

Rhodes also complains that his counsel was ineffective in failing to prevent Abed from testifying without an interpreter. Rhodes acknowledges, and the trial transcript reflects, that his counsel objected to the fact that an interpreter was not available to aid Abed's trial testimony. Specifically, defense counsel stated:

> I'm going to object to the testimony to be given by this witness. I think the court is aware of the fact that Mr. Abed is of Palestinian decent [sic]. He speaks English possibly as a second language. We were here on February 26th of this year at which time Mr. Abed gave testimony in this matter and it was necessary to employ the services of an interpreter at that time. And I would respectfully request that if Mr. Abed is going to testify that he do so through a certified interpreter.[110]

The trial judge implied by noting the objection for the record, but ordering that the examination of Abed and his testimony "proceed."[111] The trial transcript reflects Abed's examination and testimony proceeded in English, fully and without any apparent difficulties.[112]

Rhodes contends that his trial counsel should have done more to obtain the aid of an interpreter. Rhodes argues that counsel should have investigated the matter to find out ahead of time if the State was providing an interpreter at trial. However, the trial transcript reflects that such an investigation would have been futile, since the State did

---

[110]State Record Vol. 4 of 9, p. 64.

[111]Id.

[112]Id. at pp. 64-72

not know that an interpreter would not be present until the last moments on the morning

of trial.[113]

> MR. O'CALLAGHAN [prosecutor]:
> Your Honor, the State has a witness, Mr. Basem Abed, who is of a (sic) Palestinian origin. There has been some issue in the past as to his ability to testify without a translator. At motion hearings, he testified with a translator, a certified translator present. At this date the State's translator has apparently had a death in the family and is not available. The State just found out about this very recently just now in court . . . .[114]

In response to the trial judge's inquiry as to whether another interpreter could be found,

the prosecutor responded: "I'm not aware of anybody other than the service that we

retained previously, Judge."[115]

Rhodes also insists that counsel should have sought to have the trial continued

until an interpreter could be present.  However, the trial transcript reflects that defense

counsel in fact urged that the trial be continued until an interpreter could be attained,

stating: "I'd hate to see us go through this entire trial and have it kicked back on appeal

because my client was not able to properly cross-examine the witness against

him . . . ."[116]  In response, the trial judge stated "that if the defendant is deprived in any

---

[113]Id. at p. 60.

[114]Id. at p. 58.

[115]Id. at p. 60.

[116]Id.

way of proper cross-examination, I will stop the trial and find somebody that can speak Arabic of (sic) his language."[117]

The transcript reflects that the defendant was not deprived of proper cross-examination. On the contrary, defense counsel was able to question Abed fully and to elicit favorable testimony from Abed.

> Q. Okay. On the - - on the day that the driver was shot, did you see any of that, did you see the driver being shot? Did you go outside and see any of - -
> A. No, I - - when he come inside, he said "I got shot." Okay. I scared, I got guns in the store, I take the gun and go outside. I'm check outside. I look left, right, I didn't see nobody.
> Q. You saw no one?
> A. I didn't see nobody, no.
> Q. And did you tell this to anyone from the New Orleans Police Department?
> A. Yeah.
> Q. Then Troy came to the store you said a couple days after the robbery?
> A. Yeah.
> Q. And said to you that he didn't shoot anybody, basically.
> A. Yeah. [118]

Abel provided similar, consistent testimony on direct examination.

> Q. Okay. Today, here now in court, do you see the person that you knew as Troy Rhodes? Do you see him in this room right now?
> A. No.
> Q. Would you look around?
> A. Yeah, I didn't see nobody.
> Q. You don't see him today?

---

[117] Id.

[118] Id. at pp. 284-85 (emphasis added).

A. Oh, now? Yeah, I see him now.  Right there.
Q. Okay.
A. Sorry.[119]

I find that trial counsel was in no way deficient in connection with the presentation of Abed's testimony and that defendant was in no way prejudiced by the absence of a translator. Defense counsel objected when a translator was not available.  She suggested that a trial delay might be in order.  The trial judge rebuffed these efforts.  Nevertheless, the defense was in no way hindered by the lack of an interpreter.  Abed was able to testify fully in English.  Some of his testimony was useful to the defense. The state courts' denial of relief on this ground was not erroneous, and Rhodes is not entitled to federal habeas relief on this ground.

(3)    <u>EX PARTE BENCH CONFERENCE</u>

Rhodes argues that his right to adequate appellate review and his right to counsel at a critical stage of the proceedings were violated.  These alleged violations stem from an untranscribed <u>ex parte</u> bench conference between the trial judge and the jury foreperson during jury deliberations.

Although my research has located no post-AEDPA decisions specifically addressing what substantive habeas legal standard of review applies to this claim, it appears that habeas corpus claims alleging that ex parte communications between a judge

---

[119]<u>Id</u>. at pp. 65-66 (emphasis added).

and a juror are constitutional error are questions of federal law, while the substance and effect of such communications present questions of historical fact. <u>Rushen v. Spain</u>, 464 U.S. 114, 120 (1983). Accordingly, I will treat this claim as a mixed question of law and fact as to which the state courts' decision rejecting this claim must receive deference, unless it was contrary to or involved an unreasonable application of clearly established Supreme Court precedent.

In <u>United States v. Gypsum Co.</u>, 438 U.S. 422, 460 (1978), the Supreme Court recognized that "[a]ny <u>ex parte</u> meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error." The Court's statement in this regard was based on three factors. First, unexpected questions can lead to unintended and misleading comments, especially when counsel are not present to challenge the judge's comments. <u>Id</u>. Second, "any occasion which leads to communication with the whole jury panel through one juror inevitably risks innocent misstatements of the law and misinterpretations despite the undisputed good faith of the participants." <u>Id</u>. at 461. Third, "the absence of counsel from the meeting and the unavailability of a transcript or full report of the meeting aggravate the problems of having one juror serve as a conduit for communicating instructions to the whole panel." <u>Id</u>. <u>See</u> <u>United States v. Peters</u>, 349 F.3d 842, 846 (5th Cir. 2003) (court reiterated and

relied on the three pitfalls of <u>ex parte</u> conferences between a judge and a juror as described in <u>Gypsum</u>).

Five years after its decision in <u>Gypsum</u>, however, the Supreme Court in <u>Rushen</u> vacated the granting of a writ of habeas corpus by lower federal courts and "emphatically disagree[d]" with the lower courts' view that unrecorded ex parte communications between trial judge and juror can <u>never</u> be harmless error. <u>Id.</u> at 117. The <u>Rushen</u> Court noted that few trials occur "in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." <u>Id.</u> at 118. The Supreme Court rejected a per se rule that any such ex parte communication required reversal of a conviction because such a hard and fast rule "ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of justice." <u>Id.</u> at 119. "This is not to say that ex parte communications between judge and juror are never of serious concern or that a federal court on habeas may never overturn a conviction for prejudice resulting from such communications for constitutional error, if any, that has occurred." <u>Id.</u> at 119-20.

The <u>Rushen</u> Court instructed that "[w]hen an ex parte communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties." <u>Id.</u> at 119. In his opinion concurring with the per curiam majority, Justice Stevens stated: "I think it quite clear that the mere occurrence of an ex

47

parte conversation between a trial judge and a juror does <u>not</u> constitute a deprivation of any constitutional right.  The defense has <u>no</u> constitutional right to be present at every interaction between a judge and a juror, <u>nor is there a constitutional right to have a court reporter transcribe every such communication</u>." <u>Id.</u> at 125-26 (emphasis added).  Instead, he noted that the only "error of constitutional dimension" that might arise from such a communication might be whether the defendant "was denied his core due process right to notice and an opportunity to be heard in a meaningful manner and at a meaningful time" if the communication raised a question about a juror's impartiality.  <u>Id.</u> at 126.

As recently as last year, a district court in this circuit, relying on the above-quoted language from <u>Rushen</u> as reiterated in <u>United States v. Gagnon</u>, 470 U.S. 522, 526-27 (1985), rejected a habeas claim similar to Rhodes's in this case. The court stated: "In order for the ex parte communication [between judge and juror] to rise to the level of a due process violation, it must render the trial fundamentally unfair." <u>Tippett v. Stephens</u>, 2013 WL 4854522, *10 (N.D. Tx. Sept. 11, 2013).

In Rhodes's case, although there is no transcript reflecting what was said during the bench conference between the trial judge and the jury foreperson, the trial transcript establishes the circumstances under which the conversation took place, the length of the discussion, and what the trial court stated immediately after the conference.

(The Jury retires to deliberate at 3:55 p.m.)

(The Jury returns and is seated in open Court at 5:55 p.m. for further instruction.)

THE COURT:

Ladies and Gentlemen of the Jury, it is my understanding you wanted to ask a question.

(Addressing the Foreperson:) Miss Richardson, you have a question for the jury that you had wanted to ask?

FOREPERSON RICHARDSON:

Yes, sir, and we voted four times and can we tell you the outcome?

THE COURT:

Would you approach the bench? (The court engages in a bench conference with Foreperson Richardson.)

Ladies and Gentlemen, it's my understanding through your foreman that you all have made several votes in regard to the case already. Is that right? (All jurors respond in the affirmative.) Okay. Do you all feel that there's a possibility of coming back with a verdict in this case? With a little further deliberation, is there a possibility to have a verdict in this case? [Directing his question to the foreperson,] [d]o you think so?

FOREPERSON RICHARDSON:

At this time, Your Honor, I think there is some discrepancies about the testimony and some of the other eyewitnesses that testified in this case.

THE COURT:

Okay. Maybe you all should return and reexamine it and see whether or not you can reach a verdict in the case. Anything I say here, I don't want you to think that I am forcing a verdict or any of that. But if you carefully examine the facts again and you can reach a verdict and you're not hopelessly deadlocked, I think you all can maybe make another attempt to talk it out a little bit longer. Why don't you all step upstairs and see if that's possible? And if not, you can come back and talk to me again.

(The Jury again retires to deliberate at 6:00 p.m. )

(The Jury returns and is seated in Open Court at 6:26 p.m. to render its verdict.)[120]

---

[120]State Record Vol. 4 of 9 (trial transcript at pp. 132-33 (emphasis added).

A comparison of the circumstances of the ex parte communication in Gypsum with the ex parte communication in the instant matter shows significant distinctions.   In Gypsum, the jury foreperson wrote a note requesting a meeting with the judge to discuss the condition of the jury and for further guidance.[121]  Following the closed-door meeting, the Gypsum trial judge did not call the jury back into the courtroom to receive further instructions commensurate with his discussion with the foreperson.  Instead, the trial judge sent the foreperson back to the jury room.  Under such circumstances "it can fairly be assumed that the foreman undertook to restate" what he understood the judge's instructions to be.  Id. at 461.

By contrast, in Rhodes's case, the entire jury was brought into the open courtroom, where both defendant and his counsel were present. The foreperson did not request a private meeting with the judge; instead, she announced in open court that the jury had voted four times and asked, "can we tell you the outcome?"  In response, the trial judge did not usher the foreperson back to his chambers for a private discussion.  Instead, rather than have the foreperson announce the result of the jury's voting in open court, the judge called her to the bench for a side-bar conference, while still seated on the bench in open court in the presence of all spectators including defendant and his counsel.  The

---

[121]In Gypsum, the jury had heard five months of testimony, were sequestered when deliberations commenced and were in their seventh day of deliberations when the foreman sent a note to the trial judge.  Id. at 459-60.

untranscribed bench conference between judge and juror was very brief, given that the jury was in the courtroom for only five minutes, having entered at 5:55 p.m. and exited at 6:00 p.m., according to the above-quoted trial transcript excerpt.

Though not transcribed, it can reasonably be concluded that the foreperson, as she announced she wanted to do, told the judge where the voting stood, and that defendant and his counsel understood the substance of the short conversation, which they saw but did not hear. Thus, they had the kind of notice of what was occurring that <u>Rushen</u> states should occur.  Immediately thereafter, the trial court stated, in open court with counsel present: "[I]t's my understanding through your foreman that you all have made several votes in regard to the case already." The court then provided further instructions to the jury, again in open court with counsel present, regarding the possibility of reaching a verdict, all in the nature of the well-established <u>Allen</u> charge.[122]  Thus, the foreperson was not placed in a position of having to "serve as a conduit for communicating instructions to the whole panel." Nor was defense counsel denied an opportunity to correct any mistaken impression which may have resulted from the trial court's instruction, because she was present in the courtroom for both the conversation and its immediate effects.

---

[122]The phrase "<u>Allen</u> charge" arises from <u>Allen v. United States</u>, 164 U.S. 492, 501 (1896), and refers to supplemental instructions routinely provided to encourage a "seemingly-deadlocked" jury to continue to try to reach a verdict. <u>United States v. Hill</u>, 334 Fed. Appx. 640, 643 (5th Cir. 2009).

Controlling law "affords little tolerance for any <u>ex parte meeting</u> between judge and juror during deliberations," but only when the potential for problems is elevated by the fact that counsel is not available to remedy such problems. <u>Peters</u>, 349 F.3d at 848 (emphasis added); <u>see</u> <u>United States v. Cowen</u>, 819 F.2d 89, 91 (5th Cir. 1987) ("exclusion of counsel denied the defendants any chance to correct any mistaken impressions" resulting from the judge's private comments).

In the instant case, the brief communication between the judge and the foreperson, which was conducted in the open courtroom at side-bar and in the presence of all other trial participants, cannot be categorized as the kind of closed-door private meeting, conducted without counsel's knowledge, proscribed in <u>Gypsum</u> that affected in any way the fundamental fairness of the trial and about which the Supreme Court has cautioned in <u>Rushen</u>.[123] The judge's subsequent instruction to jurors cannot reasonably be construed to have given the wrong impression or resulted in fundamental unfairness, such as unduly coercing jurors to reach a verdict, because the instruction was consistent with <u>Allen</u>. Defendant and his counsel were present in court when the conversation occurred and the instruction was provided, and any error or objectionable statement could easily have been remedied by their objection, but none occurred.

---

[123]In contrast to an <u>ex parte</u> closed-door communication which is uncommon, an <u>ex parte</u> in-court side-bar communication is not particularly unusual. <u>See e.g.</u>, <u>United States v. Sanchez</u>, 35 F.3d 673, 678 (2nd Cir. 1994) (trial judge held <u>ex parte</u> side bar conference with defense counsel); <u>Rodriguez v. United States</u>, 2003 WL 21817699, *3 (E.D. Mich. July 14, 2003) (same); <u>United States v. Munoz-Franco</u>, 203 F.Supp.2d 102, 103 (D. Puerto Rico Apr. 23, 2002) (same).

For the foregoing reasons, I find that the state courts' denial of relief on this ground was not contrary to or an unreasonable application of United States Supreme Court precedent.  Rhodes is not entitled to relief on this claim.

(4)　　TRIAL JUDGE RECUSAL

Rhodes also argues that he was denied due process when the trial judge refused to recuse himself during post-conviction proceedings because he was a material witness. Specifically, Rhodes contends that "the unrecorded _ex parte_ discussion between [the trial judge] and the jury foreperson during deliberations constitutes evidence material to the defense of the accused, and the testimony as to these conversations can be incontrovertibly established only through the testimony of [the trial judge] . . . ."[124]  In support of his argument, Rhodes relies solely upon state statutory law, state case law and the state code of judicial conduct.[125]

To the extent Rhodes argues that the state courts erred under state law standards of judicial recusal, this alleged violation of state law does not merit federal habeas corpus relief.  This is so because a federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law."  Wilkerson v. Whitley, 16 F.3d 64, 67 (5th Cir. 1994) (quotation omitted); see also Swarthout v. Cooke, 131 S.

---

[124]Record Doc. No. 15, p. 20.

[125]Record Doc. No. 15, pp. 18-21.

Ct. 859, 861 (2011) (federal habeas review does not lie for errors of state law); accord Molo v. Johnson, 207 F.3d 773, 776 n.9 (5th Cir. 2000); Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998) (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Lewis v. Jeffers, 497 U.S. 764, 780 (1990); West v. Johnson, 92 F.3d 1385, 1404 (5th Cir. 1996)); see also Hogue v. Johnson, 131 F.3d 466, 506 (5th Cir. 1997) (a disagreement as to state law is not cognizable on federal habeas review).

Federal habeas corpus review is limited to questions of constitutional dimension, and federal courts generally do not review questions of state law. Estelle, 502 U.S. at 67-68; Gonzales v. Thaler, 643 F.3d 425, 429 (5th Cir. 2011); Jernigan v. Collins, 980 F.2d 292, 298 (5th Cir. 1992). The fact that a trial judge may be subject to disqualification under a state statute, state case law or a state code of judicial conduct does not generally implicate the Constitution. Badeaux v. Leblanc, 2005 WL 3501423, *9 (W.D. La. 12/21/05) (citing Bracy v. Gramley, 520 U.S. 899, 904-05 (1997); Fero v. Kerby, 39 F.3d 1462, 1479-80 (10th Cir.1994); Dyas v. Lockhart, 705 F.2d 993, 997 (8th Cir.1983); Nichols v. Scott, 69 F.3d 1255, 1277 (5th Cir.1995) (citation omitted)). A federal habeas corpus court cannot grant relief unless errors in a state court proceeding resulted in the "denial of fundamental fairness" under the Due Process Clause. Neal v. Cain, 141 F.3d 207, 214 (5th Cir.1998) (citing Porter v. Estelle, 709 F.2d 944, 957 (5th Cir.1983)).

Most questions concerning a judge's qualifications to hear a case are not constitutional ones.  Buntion v. Quarterman, 524 F.3d 664, 672 (5th Cir. 2008).  Under federal statutory law, a judge is required to recuse himself if he is likely to be a material witness.  Liteky v. United States, 510 U.S. 540, 547 (1994).  Federal  statutory law, however, is "more demanding than that required by the Due Process Clause."  United States v. Couch, 896 F.2d 78, 81 (5th Cir.1990) (citations omitted). "[T]he floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case."  Bracy, 520 U.S. at 904-05; Buntion, 524 F.3d at  672; Samuel v. Warden, Avoyelles Correctional Center, 51 Fed. Appx. 483 (5th Cir. 2002).  Two presumptions weigh in favor of finding that a judicial officer properly discharged his or her duties fairly and impartially: "(1) the presumption of honesty and integrity of the adjudicators; and (2) the presumption that those making decisions affecting the public are doing so in the public interest."  Bigby v. Dretke, 402 F.3d 551, 560 (5th Cir. 2005) (citing Bracy, 520 U.S. at 909).

Presumptive bias has been found in only three situations:  (1) the decision-maker has a direct or pecuniary interest in the outcome of the case; (2) an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) a judicial or quasi-judicial decision-maker has the dual role of investigating and adjudicating disputes

and complaints.  Bigby, 402 F.3d at 560.  To secure federal habeas relief on this basis, the petitioner must "establish that a genuine question exists concerning [the judge's] impartiality."  Id., at 559 (citing Liteky v. United States, 510 U.S. 540, 552 (1994)).  An appearance of impropriety rising to the level of a fundamental defect resulting in a complete miscarriage of justice must be shown; absent that level of severity, habeas relief is not cognizable.  United States v. Couch, 896 F.2d 78, 81 (5th Cir. 1990).

As a general matter, habeas claims asserting violation of due process rights of this type present a mixed question of law and fact.  Wilkerson v. Cain, 233 F.3d 886, 890 (5th Cir. 2000).

In this case, Rhodes has failed to make the required showing.  He has not alleged any particular bias or unsupported action or ruling by the state trial judge in his post-conviction proceedings.  He has not shown that the judge acted with personal interest or bias in denying his application on procedural grounds.

Rhodes sought to have the trial judge testify during post-conviction proceedings regarding the actual content of his brief bench conference with the jury foreperson.  However, as discussed above, the general nature of the conversation was generally understood by all, and the express content of the bench conference communication was not material.

Based upon the context and open court setting in which the bench conference was conducted, its brevity, and the trial judge's actions immediately following it, it is apparent that the conference essentially consisted of the foreperson informing the judge of the status of the jury's vote.  Thereafter, the judge did not impart information privately to the jury foreperson.  Instead, he made a statement in open court to the entire jury, in the presence of defendant and his counsel.  Had testimony regarding what was said during the bench conference been obtained, it would not have made a difference in Rhodes's proceedings, i.e., he would not have been entitled to a new trial.  Thus, such testimony, whether from the trial judge or the jury foreperson, was not material and would not have altered the outcome of Rhodes's state court conviction.  Hall v. Thaler, 2012 WL 6643155, *3 (5th Cir. 2012) (testimony is not material if it is not reasonably probable that the outcome would have been different if the testimony had been introduced).[126]

Thus, I find that no due process violation occurred in the state judge's refusal to recuse himself from the post-conviction proceedings.  The state courts' denial of relief on this ground was not contrary to or an unreasonable application of Supreme Court or other federal constitutional precedent.  Rhodes is not entitled to relief on this claim.

---

[126]The definition of "material" provided in Hall was in the context of the petitioner's claim that material evidence had not been disclosed to the defense in violation of Brady v. Maryland, 373 U.S. 83 (1963).

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that the petition of Troy Rhodes for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[127]

New Orleans, Louisiana, this ___11th___ day of February, 2014.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[127]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.