## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TROY RHODES**                                                    **CIVIL ACTION**

**VERSUS**                                                         **NO. 11-0399**

**BURL CAIN, WARDEN**                                              **SECTION "C"(2)**

### ORDER AND REASONS

This matter is before the Court on an amended petition filed by Troy Rhodes, seeking
habeas corpus relief pursuant to 28 U.S.C. §2254. The Court, having considered the Report and
Recommendation of the United States Magistrate Judge, petitioner's objections to the Report, the
petition and amendments, the record, and the applicable law, hereby rejects the Report and
Recommendation. In light of the fact that petitioner has presented a meritorious claim of
ineffective assistance of trial counsel, the Court will order an answer from the defendant on
petitioner's allegations of ineffective assistance of post-conviction counsel by October 31, 2014
at 4:30 P.M. Petitioner's motion for subpoena *duces tecum* for records related to trial counsel's
ineffectiveness is DISMISSED WITHOUT PREJUDICE as MOOT. (R. Doc. 38.)

I.      FACTUAL BACKGROUND & PROCEDURAL HISTORY

A.      Trial & Appeal

Petitioner is currently serving a combined sentence of 149 years at Louisiana State
Penitentiary at Angola for the armed robbery and attempted second degree murder of David
Blohm, a bread delivery driver, on June 19, 2002, in violation of La. Rev. Stat. 14:64, 14:27, and
14:30.1. The State of Louisiana, through the District Attorney of Orleans Parish, instituted
charges against petitioner for these crimes on August 22, 2002.  (R. Vol. 1 of 9, Bill of
Information.)

The Louisiana Fourth Circuit Court of Appeal summarized the evidence in this case as

follows:

The victim, David Blohm ("Blohm"), testified that on 19 June 2002, he was employed as a delivery person for Leidenheimer Bakery. On that same date, between the hours of 10:00 and 11:00 a.m., he had completed his delivery to A&D Food Store on Touro Street in New Orleans and returned to his delivery truck when a man, later identified as Rhodes, entered the truck on the passenger side holding a sawed off shotgun. The person demanded Blohm's money. Blohm cooperated and turned over $160.00 of his delivery money. The perpetrator was not satisfied with the sum and insisted that Blohm must have had more. Blohm removed his wallet and gave the perpetrator $60.00 of his personal funds. Still not satisfied, the perpetrator kept asking for more money. Blohm told him that he did not have anymore [sic]. The perpetrator asked for Blohm's wallet, but Blohm did not comply. The perpetrator forced Blohm out of the truck on to the sidewalk where Blohm was shot once in the abdomen. The perpetrator fled the scene.

Blohm made his way back into the A&D Food Store where the clerk called for medical assistance. Blohm was transferred to Charity Hospital. Blohm testified that while in his delivery truck and on the sidewalk, he stood three to five feet away from the perpetrator, and had an opportunity to look at him for almost two minutes each time.

Basem Abed ("Abed"), a clerk at and co-owner of A&D Food Store, testified that on the day Blohm was robbed and shot, Rhodes was in the store to purchase beer thirty to forty-five minutes before the shooting. Abed further testified that Blohm made his bread delivery, made a purchase, and returned to his truck. A short time later Blohm returned to the store and said he had been shot. Abed testified that he walked to the door of the store but did not see anyone. According to Abed, three days after the shooting Rhodes returned to A&D Food Store to ask if someone had said he had shot the bread man. Abed and the storeowner told Rhodes that they had not said that he shot the bread man.

Lieutenant Christy Williams, of the New Orleans Police Department, testified that she conducted a follow-up investigation in the robbery and shooting of Blohm. On the day of the shooting Lieutenant Williams attempted to speak to Blohm, but she was unable to do so because of Blohm's condition. The lieutenant further testified that she developed suspects in the shooting and composed a photo line-up. On 22 June 2002, Lieutenant Williams showed Blohm the photo line-up, but he was unable to make an identification.

On 24 June 2002, Lieutenant Williams composed a second photo lineup and presented it to Blohm. However, Blohm was not feeling well, and again was unable to make an identification. Lieutenant Williams testified that she received information from Officer Juan Barnes assigned to the CrimeStoppers tip line regarding the identity of the perpetrator in Blohm's robbery and shooting. Lieutenant Williams verified the information and composed a third photo line-up. [On 25 June 2002] Blohm was shown the third line-up, and he identified Rhodes as the perpetrator. Lieutenant Williams prepared an arrest warrant for Rhodes and

search warrants for his last two known addresses. From the first address searched, the police retrieved a pair of blue jean shorts fitting the description of those worn by the perpetrator, letters and papers with Rhodes' name on them, and a photo of him.

Lieutenant Williams further testified that she received a phone call from someone saying that he knew the location of the shotgun used in the robbery and shooting. Again, Lieutenant Williams verified the information and obtained a search warrant for the location given in the information. The caller indicated the gun could be found inside or outside of the location. The residence at 2171-2173 North Dorgenois Street was searched and a shotgun was found wrapped in a shirt under the house near some concrete steps. (R. Vol. 2 of 9, *State v. Rhodes*, 2003-KA-1326, at 1-3 (La. App. 4 Cir. 04/14/04) (unpub.)).

The trial court appointed the Orleans Indigent Defender Program (OIDP) to represent petitioner at his arraignment. (R. Vol. 1 of 9, Docket Master 1.) Counsel entered a plea of not guilty to the charges on his behalf and later filed motions to suppress the identification by Blohm, exclude testimony by Basem Abed regarding statements of petitioner and others in the aftermath of the shooting, and exclude the shotgun found under the North Dorgenois Street house(s) as irrelevant and prejudicial. (*Id.* at 1-2.) The trial judge denied the motions with respect to Blohm's photographic identification and the shotgun. (R. Vol. 3 of 9, Motions Hearing Tr. 168-170, Nov. 20, 2002.) Although the judge initially excluded Abed's proposed testimony, he later reversed himself. (R. Vol. 3 of 9, at 75 (per curiam order).)

The matter was tried before a 12-person jury on June 4 and 5, 2004. Despite initially reporting their inability to come to a verdict, the jury eventually found petitioner guilty as charged on both counts of the bill of information. (R. Vol. 4 of 9, Trial Tr. 133-34, June 4-5, 2004.) The trial court imposed consecutive sentences of 99 years and 50 years for the armed robbery and the attempted second-degree murder, respectively - the maximum combined sentence allowed by statute - in light of petitioner's criminal history of armed robbery and attempted armed robbery. (R. Vol. 4 of 9, Sentencing Tr. 10, June 25, 2003.)

On appeal, petitioner challenged the sufficiency of the evidence, the admission of the shotgun, and excessive nature of the sentence imposed. (R. Vol. 2 of 9, *State v. Rhodes*, 2003-KA-1326 (La. App. 4 Cir. 04/14/04) (unpub.)) The Fourth Circuit Court of Appeal rejected these assignments of error and affirmed the convictions but not the sentence. (*Id.*) The sentence was remanded for ruling on petitioner's motion to reconsider sentence. (*Id.*)

After the trial court denied the motion to reconsider, petitioner sought writs of certiorari from the Louisiana Supreme Court, on every appellate ground, including excessiveness of sentence on May 12, 2004. (R. Vol. 5 of 9.) Petitioner requested his D.A. file on January 19, 2004; the D.A.'s Office declined to release the file because his appeal was still pending. (R. Vol. 8 of 9, Letters from William D. Aaron, Jr. to Petitioner, Jan. 23 and 27, 2004.) The Louisiana Supreme Court denied writs without opinion on October 15, 2004. (R. Vol. 5 of 9, *State v. Rhodes*, 2004-K-1161 (La. 10/15/04), 883 So.2d 1042.)  Petitioner's convictions and sentences became final 90 days later, on January 13, 2005, after he failed to file a petition for *certiorari* from the United States Supreme Court. 28 U.S.C. 2244(d)(1)(A).

B.      State Post-Conviction Relief Proceedings

On August 12, 2005, petitioner, represented by counsel, filed an application for post-conviction relief at the trial court, alleging that counsel had rendered ineffective assistance in failing to exclude or properly object to Basem Abed's testimony and the shotgun. (R. Vol. 7 of 9 (unnumbered).) He also argued that the trial court erred in denying his motion to reconsider sentence. (*Id.*) On January 3, 2006, petitioner filed a *pro se* motion to recuse the trial judge. (R. Vol. 6 of 9 (unnumbered).)

In response to petitioner's request dated July 28, 2005, the D.A. informed petitioner in

May 2006, that his D.A. file could not be located due to Hurricane Katrina related disarray,  (R. Vol. 8 of 9, Letters from William D. Aaron, Jr. to Petitioner, May 11 &12, 2006.) On April 11, 2007, at petitioner's request, the Orleans Public Defender ordered the files of trial counsel from petitioner's case. (R. Vol. 8 of 9, Letter from Joshua Perry to Petitioner, Apr. 11, 2007.)

On November 30, 2007, the trial court held a hearing on the application for post-conviction relief, wherein trial counsel and petitioner testified as witnesses. At this hearing, trial counsel noted that the records that petitioner had been given from OIDP represented scarcely one-tenth of her actual file from the case and that these records were missing, among other things, the victim's medical records from Charity Hospital. (R. Vol. 7 of 9, Hearing Tr. 4-5, Nov. 30, 2007.) At the end of the hearing, counsel asked for a copy of petitioner's District Attorney file. (*Id.* at 20.) The assistant district attorney at this hearing stated that he had no objection to the request but indicated that he did not have the file with him. (*Id.* at 21.) On April 22, 2008, after supplemental briefing and oral argument, the trial court denied the application for post-conviction relief. (R. Vol. 7 of 9, Hearing Tr. 13, Apr. 22, 2008.)

On August 27, 2008, the Fourth Circuit Court of Appeal denied writs, finding no merit to petitioner's claims of ineffectiveness; that court determined that his excessive sentence claim was procedurally barred and that his motion to recuse the trial judge was untimely. (R. Vol. 6 of 9, *State v. Rhodes*, 2008-K-797 (La. App. 4 Cir. 08/27/08).) Petitioner sought writs from the Louisiana Supreme Court through counsel on September 26, 2008. (R. Vol. 8 of 9, unnumbered.)

While this writ application was pending, on November 25, 2008, the District Attorney's Office sent post-conviction counsel a letter stating that it had been unable to locate the DA file. (R. Vol. 8 of 9, Letter from David S. Pipes to Kevin V. Boshea.) In response to this letter,

petitioner filed a *pro se* motion to compel the District Attorney to produce his case file. (R. Vol. 8 of 9, unnumbered.) Subsequently, in December 22, 2008, he sought a writ of mandamus from the Fourth Circuit Court of Appeal to compel a contradictory hearing on the issue; the Fourth Circuit denied writs on February 18, 2009. (R. Vol. 8 of 9, *State v. Rhodes*, 2009-K-0040 (La. App. 4 Cir. 02/18/09) (unpub.).)

On July 6, 2009, OPD mailed petitioner the missing portion of trial counsel's file that she had alluded to in her testimony on November 30, 2007, including the victim's medical records from Charity Hospital. (R. Vol. 8 of 9, Letter from Leon Roche II to Petitioner). Petitioner immediately moved the Louisiana Supreme Court to stay his pending writ application so that he could supplement his unsuccessful application for post-conviction relief with additional claims that the State had suppressed the victim's medical records until the last possible moment in violation of *Brady v. Maryland*, and that trial counsel had been constitutionally ineffective in failing to expose perjured testimony that the victim was not under the influence of pain medication when he identified petitioner from the hospital. (R. Vol. 8 of 9, unnumbered.) On November 20, 2009, the Louisiana Supreme Court granted the motion to stay the pending writ applications so that plaintiff could obtain a ruling on these claims from the trial court. (R. Vol. 7 of 9, *State v. Rhodes*, 2009-KP-2348 (La. 11/20/09), 25 So. 3d 798; R. Vol. 8 of 9, *State ex rel. Rhodes v. State*, 2009-KH-0785 (La. 11/20/09), 25 So. 3d 798.)

On December 18, 2009, petitioner filed a *pro se* supplemental application for post-conviction relief, urging his *Brady* and *Strickland* claims related to the newly-obtained medical records. (R. Vol. 8 of 9, unnumbered.) However, the trial court denied the application without hearing, finding that the claims were both untimely and repetitive and therefore

procedurally barred. (*Id.*) The Fourth Circuit denied writs on this ruling on May 26, 2010 and

again on July 1, 2010. (R. Vol. 8 of 9, *State v. Rhodes*, 2010-K-0712 (La. App. 4 Cir. 5/26/10)

(unpub.); R. Vol. 8 of 9, *State v. Rhodes*, 2010-K-0782 (La. App. 4 Cir. 07/01/10) (unpub.).) The

Louisiana Supreme Court followed suit on September 28, 2010. (R. Vol. 7 of 9, *State v. Rhodes*,

2008-KP-2348 (La. 9/28/10), 45 So. 3d 1085; R. Vol. 8 of 9, *State ex rel. Rhodes v. State*,

2009-KH-0785 (La. 9/28/10), 45 So. 3d 1085).

 In the meantime, petitioner had moved the trial court for the production of the transcript

of an off-the-record bench conference with the jury foreperson in the midst of deadlocked jury

deliberations. (R. Vol. 9 of 9, unnumbered.) When there was no ruling on the motion, petitioner

sought to compel one on July 26, 2010 by applying for a writ of mandamus from the Fourth

Circuit. (*Id.*) The Fourth Circuit granted the writ insofar as petitioner's motion for production of

the transcripts was ordered filed into the trial court record and the trial court was ordered to

either provide the transcript or state for the record that it does not exist within sixty days. (R.

Vol. 9 of 9, *State v. Rhodes*, 2010-K-1071 (La. App. 4 Cir. 8/16/10) (unpub.).) The trial court

denied petitioner's motion on August 25, 2010, stating that no transcript existed for the bench

conference. (R. Vol. 9 of 9, unnumbered.) The Fourth Circuit denied writs. (R. Vol. 9 of 9, *State

v. Rhodes*, 2010-K-1364 (La. App. 4 Cir. 10/6/10) (unpub.).)

 Petitioner responded on November 15, 2010 by filing another application for

post-conviction relief based on the "newly discovered" fact that the trial judge had not ordered

that the off-the-record conference be transcribed. (R. Vol. 9 of 9, unnumbered.) Petitioner

simultaneously moved to recuse the trial court from presiding over the application. (*Id.*) Without

addressing the (third) post-conviction relief application, the trial court denied the motion to

recuse on November 29, 2010, stating in part that the motion was moot because there was no pending matter for the court's consideration. (*Id.*) The Fourth Circuit denied writs on this ruling, stating that plaintiff's underlying post-conviction claims did not entitle him to relief and that therefore the trial court did not err in failing to recuse itself. (R. Vol. 9 of 9, *State v. Rhodes*, 2011-K-0015 (La. App. 4 Cir. 1/13/11) (unpub.).) The Louisiana Supreme Court denied writs on December 16, 2011. (R. Vol. 9 of 9, *State ex rel. Rhodes v. State*, 2011-KH-299 (La. 12/16/11) (unpub.).)

C.    Federal Habeas Corpus Petition

Petitioner filed his original petition for habeas corpus on February 16, 2011. (R. Doc. 1.) In this original habeas petition, petitioner asserted two claims: (1) that the State (a) withheld exculpatory evidence, particularly the victim's medical records, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and (b) suborned perjury in violation of *Napue v. Illinois*, 360 U.S. 264 (1959) by allowing the victim to offer testimony that was false in light of his medical records; and (2) that he received ineffective assistance of counsel at trial because his counsel failed to (a) use the medical records to impeach the victim's testimony, or (b) properly object to Basem Abed's testimony, properly cross-examine him, or move for a continuance or recess due to the absence of an interpreter during the testimony. (*Id.*)

On June 29, 2011, this Court granted petitioner's motion to amend his petition and stay these proceedings pending resolution of the writ application on petitioner's third application for post-conviction relief in state court. (R. Doc. 12.) After petitioner notified the Court that his state court remedies were exhausted, the Court granted petitioner's motion to reopen and amend or supplement his petition. (R. Doc. 14.) In his supplemental petition, petitioner asserted two

additional claims, to wit: (3) that petitioner was denied his right to adequate review, his right to counsel at a critical stage of the proceedings, and his right to a fair trial due to an untranscribed *ex parte* bench conference between the trial judge and the jury foreperson; and (4) that the trial judge erred in not recusing himself from all further proceedings because he would be called as a material witness during post-conviction relief proceedings. (R. Doc. 15.)

During the course of these proceedings, petitioner has voluntarily dismissed claim 1(a) (the *Brady* portion of claim 1), conceding that it "has no merit." (R. Doc. 22 at 1.) In his most recent objections to the Report and Recommendation of the Magistrate Judge, petitioner has also voluntarily dismissed claim 2(b) (ineffective assistance of counsel with respect to Basem Abed's testimony), stating that he "will not waste any more of the Court's time" with the issue and "withdraw[s] [it] from further discussion." (R. Doc. 37 at 8.)

Thus, petitioner presently asserts four claims: (1) the State suborned perjury in violation of *Napue*; (2) he received ineffective assistance of counsel due to counsel's failure to impeach the victim's testimony by using his medical records; (3) he was denied constitutional rights resulting from an untranscribed *ex parte* bench conference between the trial judge and the jury foreperson; and (4) he was denied due process due to the trial judge's refusal to recuse himself from post-conviction proceedings.

Pursuant to 28 U.S.C. §636 (b)(1)(B) and (C), this action was referred to the United States Magistrate Judge for a Report and Recommendation. In the first Report, the Magistrate Judge found that claims 1 and 2 were procedural defaulted and that there was no showing of cause, prejudice, or a fundamental miscarriage of justice to avoid the procedural bar. (R. Doc. 27.) The Magistrate Judge further found that claims 3 and 4 were meritless, and recommended

that the petition be denied and dismissed with prejudice.  (*Id.*) After the petitioner issued objections to the first Report, the Court granted petitioner's motion to amend his petition, in which he asserted that the procedural default of his claim of ineffective assistance of counsel was caused by the ineffective assistance of his appellate counsel, in light of the Supreme Court's recent decisions in *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, ___ U.S. ___, 133 S. Ct. 1911 (2013).  (R. Doc. 29.) The Court vacated the first Report, and referred the matter back to the Magistrate Judge for a second Report. (R. Doc. 30.)

After initially ordering an answer from the defendant on the *Martinez/Trevino* issue, the Magistrate Judge opted to forgo the requirement, finding defendant's request for additional time to answer moot.  (R. Doc. 31 & 34.) On February 11, 2014, the Magistrate Judge filed his second Report, in which he reached the merits of all of petitioner's claims. (R. Doc. 36.)  The Magistrate Judge concluded that all four of petitioner's underlying habeas claims were meritless, and recommended that the petition be denied and dismissed with prejudice.  (*Id.*) Petitioner timely filed objections to the Report on February 24, 2014. (R. Doc. 37.)

II.    STANDARD OF REVIEW FOR REPORT AND RECOMMENDATION

In his objections to the Report and Recommendation of the Magistrate Judge, petitioner asserts that the Magistrate Judge erred in finding each of his claims was without merit. Therefore, the Court will review all of petitioner's claims *de novo*, pursuant to 28 U.S.C. §636 (b)(1)(C).

In his second Report and Recommendation, the Magistrate Judge interpreted the Court's order vacating his first Report and referring the matter back to him for a second Report "as a rejection of [his] previous procedural default recommendation and a requirement that [he] bypass

the State's procedural default defense and address the substance or the merits of all of petitioner's claims." (R. Doc. 36, at 3.) The Court did not intend this consequence and was seeking to have the Magistrate Judge re-examine its procedural default recommendation in light of petitioner's *Martinez/Trevino* arguments.

Because defendant raised exhaustion and procedural default in his answer to the original petition, (R. Doc. 21),[1] the Court will consider those issues before reaching petitioner's objections to the Magistrate Judge's recommendation for dismissal of his claims based on lack of merit.

III.     EXHAUSTION: CLAIM 3

"A fundamental prerequisite to federal habeas relief under §2254 is the exhaustion of all claims in state court prior to requesting federal collateral relief." *Smith v. Dretke*, 422 F.3d 269, 275 (5th Cir. 2005). A claim is considered exhausted "when the substance of the federal claim has been fairly presented to the highest state court." *Id.* In order to fairly present his claims to the state courts, a petitioner for federal habeas corpus relief "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A petitioner is expected "to present his claims before the courts in a procedurally proper manner according to the rules of the state courts." *Carter v. Estelle*, 677 F.3d 427, 443 (5th Cir. 1982). *See also Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988). Additionally, a petitioner "does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a

_____

[1] Defendant has conceded, and the Court further finds, that this petition is timely under 28 U.S.C. 2244(d).

similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

Further, the exhaustion requirement is satisfied where there is a lack of available state remedy or circumstances render the process ineffective to protect the rights of the petitioner. 28 U.S.C. 2254(b)(1)(B). Thus, the Fifth Circuit has recognized that a habeas petitioner is excused from exhaustion, "if a state fails to satisfactorily protect a prisoner's right to review . . . for the exhaustion doctrine assumes that state remedies are adequate and available." *Deters v. Collins*, 985 F.2d 789, 795 (5th Cir. 1993). In particular, "the exhaustion doctrine will not be applied when the state system inordinately and unjustifiably delays review of a petitioner's claims so as to impinge on his due process rights." *Id.*; *see also Breazeale v. Bradley*, 582 F.2d 5, 6 (5th Cir. 1978) (holding that a state habeas petition's dormancy for over one year renders the state remedy ineffective). A federal court is permitted to bypass the exhaustion requirement in such circumstances "only if the inordinate delay is wholly and completely the fault of the state." *Deters*, 985 F.2d at 796 (emphasis in original).

On the other hand, when the absence of an effective remedy at the state level is due to the petitioner's own failure to seek a remedy in a timely fashion, the claim is considered "technically" procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 731-33 (1986). Such technically defaulted claims must be dismissed with prejudice just as any other procedurally defaulted claim. *Magouirk v. Phillips*, 144 F.3d 348, 360 (5th Cir. 1998).

The requirement for exhaustion is total; that is all claims in a federal petition must comply with the exhaustion requirement before any may be considered. *Rose v. Lundy*, 455 U.S.

509 (1982); *see also Rhines v. Weber*, 544 U.S. 269, 274 (2005) ("AEDPA preserved Lundy's total exhaustion requirement"). When a petition raises a combination of exhausted and unexhausted claims, the court may dismiss the entire petition without prejudice, to allow the petitioner to exhaust the unexhausted claims. *Id.* The petitioner may bypass this option by voluntarily dismissing the unexhausted claim. However, if there is good cause for the failure to exhaust, the unexhausted claims are potentially meritorious, and there is no indication that the petitioner has engaged in dilatory tactics, the Court should instead grant a stay and abeyance of the petition to allow the petitioner to exhaust the unexhausted claims. *Id.*

Finally, a federal court may bypass the exhaustion requirement on any claim to deny it on the merits. 28 U.S.C. §2254(b)(2). However, in light of the "strong presumption" in favor of state court adjudication, this option is only appropriate where the unexhausted claim "obviously lacks merit." *Mercadel v. Cain*, 179 F.3d 271, 276 (5th Cir. 1999).

There is no question that claims 1, 2, and 4 were exhausted by proper presentation to, and subsequent adjudication by, Louisiana's courts. Defendant has argued that claim 3 of the petition as amended (*ex parte*, untranscribed bench conference) was not properly exhausted because petitioner never presented it to the Fourth Circuit, despite the Fourth Circuit's commentary on the merits of the claim in its January 13, 2011 order. Rec. Doc. 21 at 30-31; (R. Vol. 9 of 9, *State v. Rhodes*, 2011-K-0015 (La. App. 4 Cir. 1/13/11) (unpub.).) The defendant argues that the claim should be dismissed with prejudice as technically defaulted, given that it was presented more than one year after the date petitioner's conviction and sentence became final under state law. Rec. Doc. 21 at 30-31; La. Code Crim. P. art. 930.8.

The record supports that petitioner filed claim 3 in an application for post-conviction

relief along with his motion to recuse the trial judge from presiding over the application on November 15, 2010. (R. Vol. 9 of 9.) The trial judge denied the motion to recuse, indicating that the motion was moot because there was no application for post-conviction relief pending. (*Id.*) Petitioner then sought writs on denial of recusal from the Fourth Circuit, attaching his application for post-conviction relief. (*Id.*) The Fourth Circuit denied writs on the recusal issue, based solely on finding that the underlying application for post-conviction relief would not have entitled petitioner to relief in the first place. (R. Vol. 9 of 9, *State v. Rhodes*, 2011-K-0015 (La. App. 4 Cir. 1/13/11) (unpub.).) Petitioner filed a writ application expressly arguing that the Fourth Circuit had prematurely reached the merits of his application for post-conviction relief. The Louisiana Supreme Court denied writs. (R. Vol. 9 of 9, *State ex rel. Rhodes v. State*, 2011-KH-299 (La. 12/16/11) (unpub.).)

Under these circumstances, the Fourth Circuit either denied claim 3 on the merits, rendering petitioner's attempt to raise it in the Louisiana Supreme Court procedurally proper, or alternatively, the claim is still pending before the trial court. In either case, this Court would reject the defendant's technical default argument. Claims adjudicated on the merits or presently pending in the state court have not been technically defaulted. Moreover, insofar as petitioner's claim is currently pending at the trial court, due to that court's failure to act, the Court would find that the trial court has "inordinately and unjustifiably delay[ed] review of a petitioner's claims so as to impinge on his due process rights" by virtue of the four-year delay in adjudicating petitioner's application for post-conviction relief. *Deters*, 985 F.2d at 795. Thus, whether this claim is still pending or it has been denied on the merits, the Court would find that petitioner has satisfied exhaustion. Claim 3 need not be dismissed for technical default, nor does failure to

exhaust prevent this Court from considering the remainder of this petition.

III.     PROCEDURAL DEFAULT: CLAIMS 1 AND 2

A federal court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). This doctrine applies whether the state court decision rested on either substantive or procedural grounds. *Id.* In order for the state law ground to be independent of the federal question, the state court must have "'clearly and expressly' indicated that its judgment is independent of federal law, e.g., rests on a state procedural bar." *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995) (quoting *Harris v. Reed*, 489 U.S. 255, 263 (1989)). In order for a state procedural bar to be adequate to support the judgment, the procedural rule must be "strictly or regularly followed by the cognizant state court" and "applied evenhandedly to the vast majority of similar claims." *Id.* at 339. Where the last reasoned opinion on a claim explicitly imposes a procedural default, it will be presumed that subsequent decisions did not reach the merits of the claim and silently disregard the procedural default. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

A petitioner may be excepted from a procedural default if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

"Cause for a procedural default exists where something external to the petitioner, something that cannot fairly be attributed to him[,] . . . impeded his efforts to comply with the State's procedural rule." *Maples v. Thomas*, ___ U.S. ___, 132 S. Ct. 912, 922 (2012) (quoting

*Coleman*, 501 U.S. at 753) (internal quotations omitted) (emphasis in original). "Examples of external impediments include active governmental interference or the reasonable unavailability of the factual or legal basis for the claim." *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008) (quoting *Rodriguez v. Johnson*, 104 F.3d 694, 697 (5th Cir. 1997)) (internal quotations omitted). A petitioner demonstrates actual prejudice when he can show "not merely that the errors . . . created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 493 (1986)) (internal quotations omitted); *United States v. Frady*, 456 U.S. 152, 170 (1982). This "requires that the degree of prejudice resulting from . . . [the] error be evaluated in the total context of the events at trial." *Id.* at 169.

In order to demonstrate that a fundamental miscarriage of justice will occur unless petitioner's claims are considered on their merits, thus excepting petitioner from a procedural default, "the prisoner must assert his actual innocence." *Glover*, 128 F.3d at 904 (citing *Glover v. Hargett*, 56 F.3d 682, 684 (5th Cir.1995)). In order to satisfy the fundamental miscarriage of justice exception, a petitioner must "show by a preponderance of the evidence that he is actually innocent of the crime of which he has been convicted." *Rocha v. Thaler*, 626 F.3d 815, 822-23 (5th Cir. 2010) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). The Court has clarified that "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

The defendant has argued that claims 1 and 2, premised on the victim's testimony being inconsistent with his medical records, are subject to dismissal for procedural default because they were denied on independent and adequate state law grounds. (R. Doc. 15 at 14-17, 24.) The

16

Court agrees.

Petitioner raised claims 1 and 2 in his supplemental application for post-conviction relief filed December 18, 2009, after the Louisiana Supreme Court stayed review of the trial court's denial of his original application for post-conviction relief. (R. Vol. 8 of 9, *State ex rel. Rhodes v. State*, 2009-KH-0785 (La. 11/20/09), 25 So.3d 789.) The trial court denied the supplemental application for post-conviction relief containing claims 1 and 2 as untimely under La. Code Crim. P. art. 930.8 and repetitive under La. Code Crim. P. art. 930.4. The Louisiana Fourth Circuit Court of Appeal subsequently denied relief, reasoning that there was no error in the state trial court's judgment. (R. Vol. 8 of 9, *State v. Rhodes*, 2010-K-0712 (La. App. 4 Cir. 5/26/10) (unpub.); R. Vol. 8 of 9, *State v. Rhodes*, 2010-K-0782 (La. App. 4 Cir. 07/01/10) (unpub.).) Thereafter, the Louisiana Supreme Court denied relief without opinion. (R. Vol. 8 of 9, *State ex rel. Rhodes v. State*, 2009-KH-0785 (La. 9/28/10), 45 So. 3d 1085). The last reasoned opinion thus "clearly and expressly" denied petitioners claims solely on the grounds of La. Code Crim. P. arts. 930.8 and 930.4, which are plainly independent of the federal question. *Amos*, 61 F.3d at 338; *see Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997) (holding that La. Code. Crim. P. art. 930.8 is an adequate ground to support judgment); *see also, e.g.*, *Rodriguez v. Cain*, No. 06-0815, 2007 WL 4522497 (E.D. La. Dec. 17, 2007) (recognizing that La. Code Crim. P. art. 930.4 is an adequate ground for judgment). Claims 1 and 2 have been procedurally defaulted.

The Court now considers whether petitioner has demonstrated cause and prejudice for his procedural default of claims 1 and 2.

A.  <u>Claim 1: Prosecutorial Subornation of Perjury</u>

With respect to claim 1, the Court need not consider whether the record establishes cause

for petitioner's failure to comply with state procedural rules. It is obvious that there was no prejudice from whatever factors prompted the default because the underlying *Napue* claim has no merit. *Cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (holding that the showing of prejudice in the context of a *Brady* claim parallels the materiality component of *Brady* itself).

"It is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269. "The same result obtains when the state, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* "The principle that a state may not knowingly use false evidence, including false testimony, to obtain a conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Id.*

A petitioner may obtain habeas relief for a violation of *Napue* if: "(1) the statements in question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements were material." *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997) (citing *United States v. Blackburn*, 9 F.3d 353, 357 (5th Cir. 1993)). In order to establish that alleged statements are false, a petitioner must demonstrate more than "a conflict in the testimony." *United States v. Wall*, 389 F.3d 457, 473 (5th Cir. 2004); *see also Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001) ("Conflicting or inconsistent testimony is insufficient to establish perjury.") (citing *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990)). An allegedly perjured statement is material "if its use creates a reasonable likelihood that the jury's verdict might have been different." *United States v. Washington*, 44 F.3d 1271, 1282 (5th Cir. 1995) (quoting *United States v. Bermea*, 30 F.3d 1539, 1565 (5th Cir. 1994)) (internal quotations omitted).

Petitioner alleges that the victim perjured himself in a portion of his testimony during cross-examination by petitioner's counsel, where counsel asked the victim if he was taking any prescription pain medication on the day of the identification. The relevant portion of the testimony is as follows:

> Q: Okay. And when you make the identification of Troy Rhodes, obviously you were still in the hospital. Were you taking any pain medication at that time?
> A: I don't think I was, ma'am.
> Q: This would have been on the - on June 25, about six days, five days after the incident.
> A: No ma'am, I was not on anything at that time[.]
> Q: You were not on any pain medication at that time?
> A: (Witness shakes head negatively) (R. Vol. 4 of 9, Trial Tr. 95.)

Even granting that these statements were actually false when uttered (*see infra*), they could not be "material" within the Fifth Circuit definition because the defense elicited these statements on cross-examination and had access to the supposedly impeaching records. Petitioner eventually recovered them from her own files; they were further made part of the trial record. (*Id.* at 106; R. Vol. 8 of 9, Letter from Leon Roche II to Petitioner.) The Fifth Circuit has "limited material lies to those that occur as a part of the prosecution's case. Thus, when the defense elicits the alleged perjury on cross-examination, no material falsehood has occurred because the government has not itself knowingly presented false testimony." *United States v. Fields*, 13-70025, 2014 WL 3746479, at *25 (5th Cir. July 30, 2014) (quoting *O'Keefe*, 128 F.3d at 894) (internal quotation marks omitted). Under the circumstances, even assuming petitioner could establish cause for his procedural default of this claim, he could not establish the prejudice needed to raise this claim in federal court. In any event, this claim would have no merit even were the Court competent to hear it. Thus, this claim can be dismissed with prejudice.

B.      Claim 2: Ineffective Assistance of Trial Counsel

As already stated, petitioner's argument for cause with respect to claim 2 relies on allegations of post-conviction counsel's ineffectiveness in light of the recent U.S. Supreme Court decisions in *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309 (2012), and *Trevino v.* Thaler, ___ U.S. ___, 133 S. Ct. 1911 (2013). (R. Doc. 30.)

Under the rule of *Coleman v. Thompson*, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as 'cause.' . . . because the attorney is the prisoner's agent, and under 'well settled principles of agency law,' the principal bears the risk of negligent conduct on the part of his agent." *Maples*, 132 S. Ct. at 922 (quoting *Coleman*, 501 U.S. at 753-54). However, in *Martinez*, the Court recognized a narrow exception to the *Coleman* rule, holding that "where, under state law, claims of ineffective assistance of counsel must be raised in an initial-review collateral proceeding, . . . inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 132 S. Ct. at 1315, 1320.

In *Trevino*, the Court extended the *Martinez* rule to circumstances where the "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 133 S. Ct. at 1921. Therefore, in order to avail himself of the *Martinez* rule and establish cause for his procedural default, petitioner must show: (1) that he has a substantial claim of ineffective assistance of trial counsel (IATC); (2) that he had no counsel or ineffective counsel during the initial collateral review proceeding; and (3) that the initial collateral review proceedings was the first meaningful opportunity to raise the claim of ineffective assistance of trial counsel, even if it was not the first technical opportunity.

*See id.* at 1918. From this point, to establish the prejudice needed to excuse procedural default fully, petitioner would need to prove: (4) that he suffered prejudice from the ineffective assistance of his trial counsel" within the meaning of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 3562, 80 L.Ed.2d 674 (1984). *See Canales v. Stephens*, 12-70034, 2014 WL 4290612, at *10 (5th Cir. Aug. 29, 2014) (citing *Martinez*, 132 S. Ct. at 1321).

1.  *Prong 3: First Meaningful Opportunity*

Petitioner satisfies the third prong in this extremely complicated litany. Petitioner was represented at trial by Iona Renfroe of OIDP and on appeal and during the first round of his post-conviction relief proceedings by Kevin Boshea. Petitioner claims that Mr. Boshea was constitutionally ineffective for failing to raise the claim of Ms. Renfroe's ineffectiveness at trial that he now urges. Rec. Doc. 29. While Louisiana allows certain ineffective assistance of counsel claims to be heard on direct appeal, it is only those which can be resolved on the record. *State v. Ratcliff*, 416 So. 2d 528, 530 (La. 1982). This Court joins Judge Barbier in recognizing that the Louisiana direct and collateral review systems are sufficiently similar to Texas's systems to implicate the holding of *Trevino*. *See Hughes v. Keith*, No. 12-2841, 2014 WL 67587, at *11 (E.D. La. Jan. 8, 2014).

2.  *Prongs 1 and 4: Merits of the IATC Claim*

With respect to prong 1, a petitioner must demonstrate that his IATC claim is substantial, i.e., that it "has some merit." *Martinez*, 132 S. Ct. at 1318. However, prongs 1 and 4 overlap on this question, and prong 4 requires the petitioner to demonstrate outright satisfaction of *Strickland v. Washington's* prejudice requirement on his IATC claim. *Canales*, 2014 WL 4290612. While in some cases, it may make sense to consider these questions separately, in this

case, the parties have briefed the merits of this IATC claim exhaustively. The Court will

therefore analyze the merit of the IATC claim fully, understanding that the merit of the claim

would necessarily satisfy prongs 1 and 4; the absence of merit would render the remainder of the

*Martinez* test a moot point. *Cf. Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014).

a.      *Standard of Review for IATC*

Because the state trial court subjected this claim to procedural default without

considering its merits, there are no state court findings of fact or conclusions of law to which the

Court must defer in considering this claim. *See* 28 U.S.C. 2254(d). To establish ineffective

assistance of trial counsel, a defendant must prove deficient performance and resulting prejudice.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance "requires [a]

showing that counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed by the Sixth Amendment." *Id.* at 687. In order to satisfy this first prong, "the

defendant must show that counsel's representation fell below an objective standard of

reasonableness." *Id.* at 688.

"Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "Even

under *de novo* review, the standard for judging counsel's representation is a most deferential

one." *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 788 (2011). Due to "the distorting

effects of hindsight . . . a court must indulge a strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance; that is, the defendant must overcome

the presumption that, under the circumstances, the challenged action might be considered sound

trial strategy." *Strickland*, 466 U.S. at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

"A conscious and informed decision on trial tactics and strategy cannot be the basis for

constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *United States v. Jones*, 287 F.3d 325, 331 (5th Cir.2002) (quoting *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir.1983)). The failure to impeach a witness with evidence that has "significant exculpatory value" may amount to ineffective assistance of counsel. *Beltran v. Cockrell*, 294 F.3d 730, 734 (5th Cir. 2002) (holding that counsel rendered ineffective assistance where counsel's strategy was to show that her client did not have a tattoo, but only furthered this strategy by testifying to that fact, "despite other easily discoverable relevant evidence with significant exculpatory value").

To satisfy the second prong of *Strickland*, "the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt" *Id.* at 695. "A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or the jury." *Id.* at 695. In determining whether a defendant was prejudiced by his counsel's deficient performance, a court must weigh the evidence produced at trial that is unaffected by the alleged error, along with the evidence that was affected by the error

and the degree to which it was affected, and "must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 695-96.

b.       *Factual Background*

Petitioner argues that trial counsel rendered ineffective assistance of counsel by failing to impeach the victim with his medical records when he testified that he had not taken any pain medication when he identified petitioner in a line up on June 25, 2002. (R. Doc. 1-1 at 34; R. Doc. 22 at 6; R. Vol. 4 of 9, Trial Tr. 95.) Defendant argues that the impeachment value of the records in question was nil; thus, counsel could not have been ineffective for failing to use them to impeach the victim. (R. Doc. 21 at 29.) Having reviewed the records in question, the Court finds that they do in fact impeach or rebut this testimony.

The records confirm that the victim was admitted to Charity Hospital on June 19, 2002 following this incident and transferred to Slidell Medical on June 25, 2002. (R. Doc. 37 at 12.) During that time, the victim appears to have had at least 3 surgeries. Detective Williams attempted to visit him in surgery on June 19, 2002 immediately after the accident. (R. Vol. 4 of 9, Trial Tr. 32.) Further, according to the Operative Report from June 25, 2002, the victim received major surgery to repair his liver on June 24 and 25.[2]  While the Operative Report does

---

[2]The report's "INDICATION FOR PROCEDURE" states "the patient is a 32-year-old male[, who,] the day before had undergone exploratory lap and vac pack for a gunshot wound to the abdomen with obvious liver injury. The liver was closed using a Surgicel and seven packs were placed in." (R. Doc. 1-5 at 72) (emphasis added). Accordingly, on June 25, 2002, the victim was given "general endotracheal anesthesia" and had an operation to repair the "obvious liver damage," including an "obvious area of source of [sic] bleeding." (*Id.* at 72-73.) The surgeons drained some "bilious" fluid and "debrided" some "obvious liver necrosis," i.e. removed dead tissue from the liver. (*Id.* at 73); Webster's Ninth Collegiate Dictionary 328 (1983). Next, they

not say when on June 25 this surgery took place, the records contain a Doctor's Order form signed June 25, 2002 at 6:45 AM, which indicates "transfer from SICU to LSU Surgery." (R. Doc. 32 at 10.) According to the police report, the victim identified petitioner at Charity Hospital in a photo-array at 5:52 P.M. (*Id.* at 8.)

In order to establish that the victim was on potent pain medication when he identified petitioner from a photo array, petitioner has sought to rely on various documents. To his original habeas corpus petition, petitioner attached a document that he believed was the victim's Medication Administration Record from June 25. (R. Doc. 1-5 at 74-75.) However, as the Magistrate Judge determined, these are actually records from June 23 and 24. (R. Doc. 36 at 26-27.) The Court accepts that this was an honest mistake as opposed to some deliberate attempt at fraud. The "23" on the June 23 record is extremely hard to read and could be confused for a "25." (*See* R. Doc. 1-5 at 74.) What these records ultimately reflect is that petitioner was given a prescription for oral acetaminophen/oxycodone (Percocet) every 4 to 6 hours and intravenous morphine sulfate injections every 2 hours, both as needed to relieve pain from June 22, 2002 until June 25, 2002, and further intravenous Promethazine HCL as needed to relieve pain from June 22, 2002 until July 22, 2002. (*Id.*); *see, e.g.*, Prescriptions Abbreviations, http://www.d.umn.edu/medweb/Modules/Prescription/Abbreviations.html (last visited Sept. 13, 2014) (explaining the meaning of "q.4h," "P.O.," "I.V." and "prn."). These records indicate when each medication is administered and show certain gaps in administration. Nevertheless, the victim was on a continuous dose of one or more of his pain medications from at least June 23 to

---

closed the abdomen, except for the upper part, where retention sutures were required because there was no "real good fascia," i.e. connective tissue. (R. Doc. 1-5 at 73); Webster's Ninth Collegiate Dictionary 450 (1983).

June 24.

Although petitioner has not presented any Medication Administration form from June 25, 2002, this absence is not fatal to his claim. Other records persuasively indicate that the victim was at the least taking morphine when he identified petitioner from the array on June 25 at 5:52 P.M. First, petitioner has presented a "Fall Risk Assessment" form, completed for the victim by Charity Hospital medical staff, which shows that the victim received the same medication sub-score for each day he was hospitalized at Charity - 6 for "Schedule II, III, IV drugs PRN." (R. Doc. 37 at 19-20.)[3] Although "PRN" means "as needed," *see* Prescriptions Abbreviations, *supra*, it makes sense, given the apparent purpose of this form, that the score corresponds to medication actually administered.

Second and most importantly, the petitioner has presented the victim's Doctor's Order forms for June 19 to 25, 2002. (R. Doc. 32 at 10-11; R. Doc. 37 at 12-17.) Like the aforementioned Medication Administration records, the June 22 Doctor's Order form shows that the victim was prescribed 2 to 4 mg of intravenous morphine sulfate every two hours "PRN" or "as needed" for breakthrough pain. (R. Doc. 32 at 10); *see* Prescriptions Abbreviations, *supra*. The June 25 Doctor's Order that mentions the victim's transfer to surgery also contains a prescription for intravenous morphine sulfate injections every two hours, except that there is no "PRN" designation.  (R. Doc. 32 at 11.) Notably, the victim's Percocet prescription retained its PRN designation even in the June 25 Doctor's Order form. (*Id.*) Thus, it appears that beginning

---

[3] Section 2254(e)(2)'s general prohibition on reliance on new evidence in habeas proceedings does not prevent the Court from considering these additional records because all of these medical records were a part of the trial exhibits and post-conviction counsel made the entire trial court record a part of the post-conviction record. (R. Vol. 4 of 9, Trial Tr. 106; R. Vol. 6 of 9, Hearing Tr. 5-7.)

whenever the victim was transferred to surgery, morphine sulfate was no longer being administered on an "as needed" basis. The need for the drug had been predetermined by the physician, based on the surgery.

As petitioner has argued, for other non-PRN drugs, the Doctor's Order form expressly indicates when, for some reason, the drug is not administered. (*See* R. Doc. 37 at 15.) No such indication is given for the morphine sulfate after June 25. Thus, the records show that on June 25, in addition to having general endotracheal anesthesia at some point before major surgery on his liver, (R. Doc. 1-5 at 72), the victim was being administered morphine sulfate injections regularly at 2-hour intervals.

As to when these injections stopped, the record is somewhat confusing. On the one hand, there is a Doctor's Order form captioned "Transfer to Slidell Memorial," indicating new prescriptions that do not include morphine; this form is signed and dated June 25 at 3:46 P.M. (R. Doc. 32 at 10.) Assuming the victim's last injection was given around 3:46 p.m., the effects of the drug would have been just wearing off around 5:52 P.M., when the victim identified petitioner. However, this record does not contain the 12 and 24 hour "chart" checks that the other Doctor's Order forms have. (*See* R. Doc. 37 at 12-17.) These checks only appear on the original June 25 Doctor's Order form that lists the morphine prescription, suggesting that it continued to remain in force within Charity Hospital, until the victim transferred to Slidell Medical. (*Id.* at 17-18.) The checks last until June 26, 2002 at 8:25 A.M., when it appears that the victim was actually transferred - the last entry on the record is "copy chart for transfer." (*Id.* at 18.) Thus, the form dated June 25 at 3:46 P.M. appears to state the victim's post-transfer prescriptions. The morphine injections themselves lasted up until the time of transfer on the morning of June 26.

(*See id.* at 17-18.)

Finally, the defendant would offer the victim's trial testimony that he was not on any pain medication as a means of undermining contrary indication of the records. Putting aside the circularity of the argument, the Court notes that the victim's initial answer to whether he was on any pain medication at the time of the identification was simply "I don't think I was, ma'am." (R. Vol. 4 of 9, Trial Tr. 95.) There was some room for the victim to be uncertain regarding what he was taking because morphine sulfate can be injected directly into a catheter instead of a person. *See* MedlinePlus, Morphine Sulfate Injection, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601161.html  (last visited Sept. 15, 2014).

The fact that the victim offered factually inaccurate testimony about the medications he was receiving does not in and of itself establish ineffective assistance of counsel. Petitioner must show that trial counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. *Strickland*, 466 U.S. at 688, 694.

c.      *Deficient Performance*

With regard to deficient performance, the petitioner has overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. It is clear from counsel's testimony at the state post-conviction hearing that her strategy at trial was to attack the reliability of the victim's identification and either prevent Basem Abed from testifying or preserve an objection to his testimony. (R. Vol. 6 of 9, Hearing Tr. 7-12, Nov. 30, 2007.) As part of the first part of this strategy, counsel clearly wanted to use the victim's condition in the hospital at the time of the identification. (*Cf.* R. Vol. 4 of 9, Trial Tr. 95.) She wanted to elicit

that he was taking medication. Yet, she was aware, having cross-examined the victim at the probable cause hearing, that he had denied being on any medication, not only at the time of the identification but any of the times he spoke with Detective Williams. (R. Vol. 3 of 9, Motions Hearing Tr. 38, Nov. 20, 2002.) Clearly, counsel was skeptical because immediately after, she filed a motion to discover his medical records. (R. Vol. 1 of 9.)

At the trial itself, when petitioner denied taking pain medication before the identification procedure, counsel offered no real challenge to his testimony. (R. Vol. 4 of 9, Trial Tr. 95.) However, as the foregoing illustrates there was powerful evidence in the victim's records that the victim had received general anesthesia, invasive surgery, and multiple morphine injections all before he supposedly identified petitioner. Further, as explained below, this evidence was extremely relevant, not only to the reliability of the victim's identification in the hospital, but also to the victim's overall credibility.

The record does not support that counsel was concerned about placing the details of victim's injuries before the jury. She failed to object to Lieutenant Williams's graphic, non-medical, hearsay description of the victim's wounds immediately after the shooting. (*Id.* at 21.) The first responding paramedic further testified extensively about the victim's injuries. (*Id.* at 57.)

Finally, the record here does not support that counsel might have been tactically limiting the scope of her cross-examination, so as not to bore or offend the jury. Immediately after failing to impeach the victim on the subject of his medication, counsel vigorously cross-examined the victim regarding his testimony that he had seen petitioner staring at him during a pretrial hearing, drawing an successful objection from opposing counsel for her argumentative style. (*Id.* at

98-99.) Counsel was willing to challenge the victim on key points.

Counsel's decision to ask the witness about pain medications but failure to use available evidence to impeach him resulted in a situation where he was allowed to falsely bolster the credibility of the identification with impunity. She failed to even mention that the victim had been in surgery the same day as the identification, a fact that she had brought out in the probable cause hearing. (R. Vol. 3 of 9, Motions Hearing Tr. 38.) Such a grievous omission cannot be accurately described as "sound trial strategy." Thus, even according substantial deference to counsel's decision-making, petitioner has established deficient performance.

### d.    Prejudice

Moreover, there is a reasonable probability of a different outcome were the jury to have heard about the victim's surgery and medication. As an initial matter, the evidence at trial apart from the victim's identification was far from insurmountable. There was no physical evidence whatsoever connecting petitioner to the scene of the crime. None of the fingerprints lifted from the delivery truck in which the crime was committed matched petitioner's fingerprints. (R. Vol. 3 of 9, Trial Tr. 53.) While Basem Abed testified that petitioner had been in the store 45 minutes before the incident, Abed looked and did not see him right after the incident. (*Id.* at 66-68.) The jury also heard that petitioner was a regular customer of the store and came in almost every day, so his presence on that day was not suspicious. (*Id.*) Further, although Abed testified that petitioner came into the store to inquire whether Abed and the store owner had identified him as the perpetrator, this was not unequivocal evidence of a guilty mind. The jury could have inferred, as Abed had testified previously, that petitioner was reacting to neighborhood rumors. (*See* R. Vol. 3 of 9, Motions Hearing Tr. 10-11, Feb. 26, 2003.) Ultimately, petitioner protested his

innocence to Abed. (*Id.* at 69.)

Apart from the victim's testimony about the incident itself, no evidence connected petitioner to the shotgun purportedly use to commit this crime. No finger prints were recovered from the gun itself, and no evidence at all connected petitioner to the house where the shotgun was recovered. (*Id.* at 45-46.) Indeed, no effort was made by law enforcement to establish such a connection. After locating the gun under the residence at 2171-2173 North Dorgenois on the basis of an anonymous tip, police failed to question any of the residents present during the search, even despite the tipster indicating that someone in the house would be involved in disposing of the weapon. (*Id.* at 41-42.) Among those present during the search, were males who could just as easily have used the gun to commit this crime. (*Id.*)

The police's search of petitioner's houses led to no meaningful evidence of his involvement in the crime. Police only recovered a pair of blue jean shorts vaguely matching the description of the perpetrator given by the victim; even Lieutenant Williams admitted that there was nothing special about them. (*Id.* at 39.)

Police had developed two other suspects at the beginning of their investigation, both of whom were involved in a robbery where a sawed-off shotgun was used in the days prior to the incident at issue. (*Id.* at 33.) The police placed a photo of one of these suspects in the first photo array provided to the victim on June 22, from which he did not identify a perpetrator. (*Id.*) However, Lieutenant Williams admitted that the victim was "pretty ill" at the time and likely taking pain medication. (*Id.* at 23.) Police never showed the victim a lineup with these two suspects again. (*Id.* at 36.)

The victim gave varying descriptions of the crime and the weapon used to commit it. He

told authorities initially that the perpetrator had entered the truck when he was taking out the extra loaf of bread for the store. (*Id.* at 110.) At trial, he testified that he had already taken the extra loaf inside the store, collected his money, and started the engine on his truck to leave, when the perpetrator tried to rob him. (*Id.* at 73-74.) He told police that he had been removed from the truck forcibly by the perpetrator and slammed against it during the robbery. (*Id.* at 111.) At trial, he stated that the perpetrator made him come out of the truck at gunpoint and walk backwards toward the truck. Id. at 85-86. Last, the victim described the weapon used to commit the crime as a blue-tinted, pump-action, sawed-off shotgun when he spoke with police. (*Id.* at 92-93.) At trial and the suppression hearing, the victim identified a bolt-action rifle, admitting that he knew the difference between bolt- and pump-action rifles. (*Id.* at 93.)

Finally, there were problems with the victim's identification even before taking into account the specter of surgery, anesthesia, and morphine. At trial, as at the probable cause hearing, the victim could not recall any of the details of the descriptions he had given police, aside from the fact that the perpetrator was wearing blue jeans and a blue shirt with some kind of athletic insignia. (*Id.* at 87.) While some basic details were consistent with petitioner's appearance and remained constant across descriptions, such as race (black), height (5'5" to 5'7"), weight (140-180 lbs.), and potentially hairstyle (braids, twists, or dreadlocks), others like complexion and age differed across descriptions and ultimately from petitioner. (*Id.* at 36.)

At the time of the incident, petitioner was a 34-year-old, light skinned black male, 155 lbs., 5'8" with tattoos on his left arm and right leg and two gold teeth. (R. Vol. 1 of 9, Arrest Report.) Right after the shooting, the victim apparently described the perpetrator as having a dark complexion. (R. Vol. 4 of 9, Trial Tr. 17.) The description changed to "light brown skin" on

June 22. (*Id.* at 34.) Similarly, anonymous 911 callers uniformly described the perpetrator as a teenager. (*Id.* at 108.) The jury heard from Lieutenant Williams that the victim described the perpetrator as anywhere from 16 to 35, depending on when he was interviewed. (*Id.* at 34.) At no time did the victim describe petitioner's seemingly distinctive gold teeth or give other facial details like eye color. (*Id.* at 94.)

The victim testified that he identified petitioner from the photo array based on his "facial expression" but was unable to elaborate on what he meant other than to note that the petitioner in his photo array picture appeared "hyped up," as the perpetrator had been during the crime. (*Id.* at 82, 89.) Although seeing petitioner in person only bolstered the victim's confidence about his identification, he testified that this was due to the fact that he and petitioner immediately recognized each other. (*Id.* at 82.) This is not so strange, <u>given that petitioner was a regular customer of the store where the victim had been a delivery man</u>. (*Id.* at 67, 73-74.)[4]  As the D.A. admitted at the post-conviction hearing, this fact, as much as any, helped support petitioner's mistaken identity defense. (R. Vol. 6 of 9, Hearing Tr. 16.)

In the end, notwithstanding the victim's "hundred" to "hundred-and-ten" percent certainty regarding the identification, the jury nearly hung based on "discrepancies about the testimony and some of the other eyewitnesses that testified in this case." (R. Vol. 4 of 9, Trial Tr. 81, 133.) Only ten out of twelve jurors ultimately voted to convict. (R. Vol. 8 of 9, Panel Selection Report Cover Sheet.)

---

[4]Although A&D was not on the victim's customary route, he had delivered there before and knew that they usually take one loaf of bread and that they were a COD customer. (R. Doc. 32 at 6; R. Vol. 4 of 9, Trial Tr. 73.) Although certain information was computerized, he testified that the driver would know whether each customer paid weekly or COD. (*Id.* at 74.)

It is against this backdrop that the Court must consider petitioner's claim that counsel's failure to impeach the victim undermines confidence in the jury's verdict of guilty. Strickland, 466 U.S. at 694-95. Because the evidence supporting guilt was already severely compromised in several respects, petitioner has less distance to travel to establish prejudice. *See Strickland*, 466 U.S. at 696 ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). Based on the evidence presented, petitioner has shown prejudice.

The Medication Administration Records from June 23 and 24, 2002 show that the victim was on a continuous stream of morphine sulfate, Percocet, and/or promethazine HCL. The Doctor's Order dated July 25 shows that the victim was given post-operative morphine sulfate injections every two hours until he left the hospital on June 26. There is no question that the near continuous administration of morphine, Percocet, and promethazine HCL in the two and a half days leading up to the victim's identification of the defendant was relevant to the reliability of that identification. *See, e.g.*, *Wilson v. United States*, 232 U.S. 563, 568 (1914) ("whether, at the moment of testifying, she was under its influence, or had recovered from the effects of its last administration, had a material bearing upon her reliability as a witness."); *Cornwell v. Bradshaw*, 559 F.3d 398, 414 (6th Cir. 2009) (the fact that a witness was under the influence of morphine during identification shows higher susceptibility to suggestion). Even at the time of petitioner's trial, studies had shown that lack of attentiveness and acute short-term memory impairment or loss were potential side-effects from morphine alone. *See, e.g.*, James P. Zacny, *A Review of the Effects of Opiods on Psychomotor and Cognitive Functioning in Humans*, 3 Experimental and Clinical Psychopharmacology 440-41 (1995); *see also* L. A. Bruins Slot and F. C. Colpaert,

*Opiate States of Memory: Receptor Mechanisms*, 19 J. Neuroscience 10520 (1999). The victim even displayed apparent memory deficits at trial. He could remember very little about his interactions with police other than the fact that they happened. (R. Vol. 4 of 9, Trial Tr. 88 ("I remember speaking to her the two times at the hospital… That's all I remember.).) He gave varying descriptions of the event, the perpetrator, and the weapon used to commit the crime. (*Id.* at 17, 34, 73-74, 85-86, 92-93, 110-11.)

The fact the victim had surgery and was placed under general anesthesia is similarly valuable impeachment evidence because "various studies [have shown] significant psychomotor and cognitive impairment after general anesthesia." R. Correa, et al., *Compliance with Post-Operative Instructions*, 56.1 Anaesthesia 481, 483 (2001). As such, "patients are customarily given instructions not to drink alcohol, drive vehicles or make important decisions for 24 h[ours]." *Id.* (emphasis added). Thus, the Operative Report could have also been utilized as impeachment evidence to undermine the reliability of the victim's identification of petitioner.

The influence of these drugs, combined with the fact that petitioner was likely familiar to the defendant, creates a significant likelihood that the initial hospital identification was mistaken. Indeed, the victim's actual words when he supposedly identified petitioner were "something keeps bringing me back to this[,] bringing me back to this man right here." (R. Vol. 4 of 9, Trial Tr. 43 (emphasis added).) A rational jury would have had concerns about whether the victim, who had never described the perpetrator's face, had accidentally picked out a vaguely familiar one in an overly eager attempt to hold someone responsible for this heinous crime. As already stated, the fact that the victim had confirmed this identification at the pretrial hearing is not as persuasive in light of the fact that petitioner was a regular customer at the store.

The records in question would have also undermined the victim's credibility. The victim initially stated that he "didn't think" he was on pain medication, but denied outright after further questioning. (*Id.* at 95.) The fact that he was actually taking powerful medication suggests either lack of candor or a dangerous unwillingness to admit uncertainty, from which the jury could have drawn negative inferences. Thus, trial counsel's failure to properly impeach the victim undermines confidence in the jury's verdict of guilt establishing a reasonable probability of a different outcome on the facts presented.

Finally, the state has argued, even assuming these records actually serve to impeach the victim, that they cannot establish prejudice because they were actually submitted to the jury. However, the victim's medical records were admitted "for purposes of the record" or "for records purposes only." (*Id.* at 106.) It is well-settled that exhibits submitted "for record purposes only" are "not for presentation to the jury, even should the jurors request to see them." *State v. Letulier*, 97-1360 (La. 7/8/98), 750 So. 2d 784, 794-95 nn. 15-16; *see also, e.g.*, *State v. Taylor*, 96-1843 (La. App. 4 Cir. 10/29/97), 701 So. 2d 766, 770 (denying claim of improper publication of evidence to the jury where "the district attorney offered the lab report for record purposes only, but defense counsel stated that he had no objection to the jury seeing it.") *writ denied*, 98-2233 (La. 1/8/99), 734 So. 2d 1224.

This mechanism exists to allow a party to supplement the record with a full exhibit when a witness reads from or otherwise uses it in his or her testimony without exposing the jury to the entire contents of the record, thereby avoiding certain evidentiary objections. It does not serve to thwart any possible claim of error, where, as here, the jury was not privy to the contents of the record. The fact that the victim's records were filed into the record as exhibit 17 for record

purposes only in no way undermines the Court's finding of prejudice.

Because petitioner shown deficient performance and prejudice, he has demonstrated that he was denied his right to the effective assistance of trial counsel. Petitioner will be entitled to issuance of the writ of habeas corpus, provided he can also establish cause for failing to raise this claim properly in the state court. The Court next considers this question.

3.    *Prong 2: Ineffective Assistance of Post-Conviction Counsel*

In order to establish cause for his procedural default of his meritorious IATC claim, the petitioner must establish that post-conviction counsel rendered ineffective assistance of counsel leading to the procedural default. The same legal standards that applied to the IATC claim also apply to petitioner's claim that post-conviction counsel was ineffective. *Martinez*, 132 S. Ct. at 1318. Petitioner must establish deficient performance and prejudice. *Strickland*, 466 U.S. at 688. Counsel's acts and omissions must be viewed with great deference and a strong presumption that they are the result of sound strategic judgment. *Id.* at 689. Prejudice will not exist unless counsel's unprofessional errors undermine confidence in the outcome of state post-conviction relief proceedings, insofar as reasonable counsel both could and would have raised the claim. *Newbury*, 756 F.3d at 872.

Petitioner has argued that counsel rendered deficient performance by failing to obtain trial counsel's file in this case, which contained the medical records that ultimately demonstrate her ineffectiveness, before submitting his application for post-conviction relief on the evidence presented. (R. Doc. 29 at 2-3.)

As a general matter, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case,

a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Post-conviction counsel, as successor to another attorney, often faces a specific duty to consult trial counsel's files. *See, e.g.*, *Martin v. Rose*, 717 F.2d 295, 296 (6th Cir. 1983) (finding ineffective assistance where counsel ignored contents of an investigative file assembled by the public defenders' office which had previously represented defendant); *Casey v. Frank*, 346 F. Supp. 2d 1000, 1014 (E.D. Wis. 2004) ("Counsel's failure to obtain predecessor counsel's investigative reports can also violate the duty to reasonably investigate."); *see also Brown v. Sternes*, 304 F.3d 677, 692 (7th Cir. 2002) (holding that "the attorney must look into readily available sources of evidence"). Post-conviction counsel who find that trial counsel has rendered ineffective assistance have a duty to raise such claims. ABA Standards for Criminal Justice: Prosecution Function and Defense Function 246 (3d Ed. 1993) ("If defense counsel, after investigation, is satisfied that another defense counsel who served in an earlier phase of the case did not provide effective assistance, he or she should not hesitate to seek relief for the defendant on that ground.").

In this case, the record supports that trial counsel filed petitioner's state application for post-conviction relief on August 12, 2005, conducted an evidentiary hearing on his behalf on November 30, 2007, and held the record open for several months, before finally agreeing to submit the matter for decision without raising petitioner's IATC claim on April 22, 2008. (R. Vol. 1, Docket Master 4.) The record also supports that counsel at no time requested to inspect or see trial counsel's file. At the November 2007 evidentiary hearing, post-conviction counsel established that parts of the OIDP file were missing from the copy he had seen. (R. Vol. 6 of 9,

Hearing Tr. 5.) OPD only located the missing portions after petitioner requested them in 2009. (R. Vol. 8 of 9, Letter from Leon Roche II to Petitioner). In light of the evidence presented at trial, it is safe to say that reasonable post-conviction counsel would have been interested to determine whether the victim's medical records undermined his claims of near miraculous recovery and superhuman pain tolerance. Insofar as it is relevant, the Court also notes that the claim of IATC set forth above is "clearly stronger" than any claim for post-conviction relief that post-conviction counsel actually raised. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000).[5]

Nevertheless, more information is needed before resolving plaintiff's claim of post-conviction counsel's deficiency. Counsel's actual investigative steps and the availability of the medical records must be established. Because post-conviction counsel made the these records a part of the post-conviction record the Court cannot simply infer that he had not seen them based

---

[5] Post-conviction counsel raised trial counsel's ineffectiveness in failing to object to Mr. Abed's testimony on hearsay and relevancy grounds and failing to exclude or suppress the shotgun from the trial, in addition to reurging the excessiveness of petitioner's sentence. (R. Vol. 6 of 9.) The sentencing related post-conviction claims were clearly procedurally barred. *State ex rel. Melinie v. State*, 93-1380 (La. 01/12/96), 665 So. 2d 1172. Moreover, post-conviction counsel's ineffectiveness claims clearly lacked merit. The proposed hearsay and relevancy objections to Mr. Abed's testimony had no merit and it was clear from the transcript that counsel made a strategic decision to forgo them in order to elicit hearsay favorable to her client. Trial counsel had in fact moved to exclude the shotgun from the trial through a pretrial motion based on the argument that it was irrelevant and prejudicial given its suspect origins. (R. Vol. 1 of 9.) On appeal, in addition to noting the lack of contemporaneous objection, the Fourth Circuit concluded that the shotgun was relevant based on the victim's testimony that it was the same gun used in the robbery. (R. Vol. 2 of 9, *State v. Rhodes*, 2003-KA-1326 (La. App. 4 Cir. 04/14/04) (unpub.).) The Louisiana Supreme Court denied writs. (R. Vol. 5 of 9, *State v. Rhodes*, 2004-K-1161 (La. 10/15/04), 883 So.2d 1042.) There was no merit to this proposed objection and therefore no possibility that the omission of a contemporaneous objection actually prejudiced petitioner.

It appears that rather than investigating petitioner's case for possible claims of trial counsel's ineffectiveness, post-conviction counsel simply tried to convert his appellate brief into an application for post-conviction relief. The Court has no doubt that if this were true, it would fall below an objective standard of reasonableness.

on the fact that he failed to request trial counsel's file. (R. Vol. 4 of 9, Trial Tr. 106; R. Vol. 6 of 9, Hearing Tr. 5-7.) Of course, it is also possible that Hurricane Katrina affected the availability of the records at the trial court. *See, e.g.*, *State v. Pernell*, 2013-0180 (La. App. 4 Cir. 10/2/13), 127 So. 3d 18, 28 *writ denied*, 2013-2547 (La. 4/4/14), 135 So. 3d 640. If this were true, it might negate a finding of deficient performance while establishing an alternative but equally meritorious "cause" for procedural default. *See Hughes*, 530 F.3d at 341 (listing examples of "causes" for procedural default external to the defendant).

Petitioner is entitled to fully and fairly develop the record on these issues. Due to the unique procedural posture of this case, the defendant has yet to issue a true answer within the meaning of Rule 5 of the Rules Governing Section 2254 Cases addressed to these questions. In light of the foregoing, the Court will order that the defendant file a supplemental answer to the allegations of post-conviction counsel's ineffectiveness by November 1, 2014. If need be, the Court will resolve any disputes of fact raised by the answer using an evidentiary hearing.[6] The Court will forego consideration of petitioner's remaining habeas claims (claims 3 and 4) until this issue has been resolved and further dismiss without prejudice petitioner's motion for

---

[6] It does not appear that petitioner would need to meet the high bar of 28 U.S.C. §2254(e)(2) before the Court could conduct an evidentiary hearing on this limited aspect of the petition. *See Henry v. Warden, Georgia Diagnostic Prison*, 750 F.3d 1226, 1231-32 (11th Cir. 2014)("When a petitioner asks for an evidentiary hearing on cause and prejudice, neither section 2254(e)(2) nor the standard of cause and prejudice that it replaced apply. . . .When a petitioner has requested an evidentiary hearing on the procedural default of a substantive claim, we need ask only whether the district court abused its discretion when it denied an evidentiary hearing on that issue."); *Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) ("We also reject the state's argument that, even if Martinez applies to the standard for Dickens to show cause, § 2254(e)(2) will bar Dickens from introducing the new evidence to the district court."); *Cristin v. Brennan*, 281 F.3d 404, 412-13 (3d Cir. 2002) ("it was within the plenary authority of the District Court to order an evidentiary hearing on the subject of Cristin's excuses for his procedural default and § 2254(e)(2) is inapplicable to those hearings.").

subpoena *duces tecum* which sought additional medical records in connection with his IATC claim. (R. Doc. 38.)

Accordingly,

IT IS ORDERED that the defendant file an answer to petitioner's allegations of ineffective assistance of post-conviction counsel by October 31, 2014 at 4:30 P.M. Petitioner's motion for subpoena *duces tecum* is DISMISSED WITHOUT PREJUDICE as MOOT. (R. Doc. 38.)

New Orleans, Louisiana this 19th day of September, 2014.

_____
HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE
